CHARLES J. BARBER V. CHARLOTTE MARTIN.

FILED FEBRUARY 4, 1903.   No. 12,208.

Commissioner's opinion, Department No. 1.

1. **Insurance Company:** STOCKHOLDER: MANAGER: STOCK: CON-
SIDERATION: SALE: REPRESENTATIONS: MAIN ISSUE. In an
action by a stockholder against the manager of an insurance
company, charging the manager, as agent, with fraudulently
concealing from plaintiff the actual consideration received for
plaintiff's stock, sold by him as agent, evidence of representa-
tions made to other stockholders similarly situated is admis-
sible when such representations are so related in character and
point of time as to furnish a basis for a reasonable inference
as to the main issue.

2. **Written Contract:** PAROL EVIDENCE. The rule that parol testi-
mony can not be admitted to vary or contradict the terms of a
written contract applies only to the parties and their privies.
Accordingly, in an action by a principal against an agent for re-
covery of the true consideration received by the agent for the
sale of stock owned by the principal, under a contract in the
agent's name, the principal is not estopped by the stated con-
sideration in the contract between the agent and a third party.

3. **Purchase of Stock:** INSURANCE COMPANY: VENDEE AS WITNESS:
CROSS-EXAMINATION: EXCLUSION ERRONEOUS. Where the evi-
dence shows conclusively that all the negotiations for the
purchase of the capital stock of an insurance company con-
templated all the stock, it is not error to exclude, on cross-
examination, the statement of a witness, who was the vendee,
as to what he would have given per share for less than all the
stock.

4. **Corporation:** OFFICERS: DIRECTORS: SHAREHOLDERS: SECRET
PROFITS. The officers and directors of a corporation and the
shareholders thereof sustain to each other the relation of
trustees and *cestuis que trustent*, and public policy forbids those
who have accepted such positions of trust to take secret profits
antagonistic to their duties as trustees.

5. ———: GENERAL MANAGER: GENERAL AGENT FOR ALL STOCK-
HOLDERS. The general manager of a corporation in effectuating
a sale of the entire capital stock of his company, acts as the
agent of all the stockholders, and he can not receive and retain
a secret compensation from the vendee for effectuating the
contract of sale.

Syllabus by court; catch-words by editor.

6. **Manager of Insurance Company: SALE OF CAPITAL STOCK: SHARE-HOLDERS.** Where a manager of an insurance company offered to make a sale of a shareholder's stock, and the shareholder expressly authorized a sale for a stated sum within a limited period, and there is evidence that both parties regarded the contract of agency to sell the stock as a continuing one— the limitation of time being only upon the power to sell at the sum stated—it was not error to admit in evidence the letter of the manager offering to make the sale, and the reply of the shareholder authorizing a sale with a limited period at a stated sum, as tending to show the existence of a contract of agency at a later period.

7. **Manager Agent for Sale of Stock.** In an action by a shareholder, as principal, against the general manager and secretary of the corporation, as agent for the sale of the shareholder's stock, to recover the difference between the actual consideration received therefor and the amount accounted for, it appeared that the general manager led the shareholder to believe that he would not purchase her stock under any circumstances; that an option to purchase the shares for a sum much larger than the manager stated he would take for his own was given to the manager by a son of plaintiff, which was fully explained to have been given for the express purpose of enabling the manager to effect a sale to third parties. A few days later the manager sent a telegram to plaintiff, stating, "Have offer $900 cash." He had never received such offer, but as a result of negotiations then pending, he later received a much higher offer. *Held*, That the manager was the plaintiff's agent for the sale of the stock.

8. **Admission and Exclusion of Evidence.** Rulings of the trial court on the admission and exclusion of evidence examined, and *held* not erroneous.

10. **Giving and Refusal of Instructions.** Rulings of the trial court in the giving and refusal of instructions examined, and *held* not error.

ERROR from the district court for Douglas county. Action by stockholder against manager of insurance company for fraud. Tried below before SLABAUGH, J. *Affirmed.*

*Westel W. Morsman* and *Virgil O. Strickler,* for plaintiff in error.

*Byron G. Burbank, contra.*

KIRKPATRICK, C.

This action was brought by Charlotte Martin in the district court for Douglas county against Charles J. Barber. The petition charged that defendant, as agent for plaintiff, undertook to sell for her eighteen shares of capital stock owned by her in the Home Fire Insurance Company of Omaha; that Barber, as such agent, sold the stock for $2,070, and paid to plaintiff $900, a balance of $1,170 remaining due. The answer of defendant was a denial. There was a trial to a jury, a verdict for plaintiff, and judgment thereon. A motion for new trial was overruled, and the case is presented to this court by Barber, plaintiff in error.

From the record it appears that on December 1, 1899, and prior thereto, defendant was the general manager, secretary and treasurer of the Home Fire Insurance Company, having its place of business in the city of Omaha. On or about November 27, 1899, certain negotiations were pending between Barber and one M. L. C. Funkhauser for the purchase by the latter of the entire capital stock of the insurance company. On November 27, 1899, Funkhauser sent a letter to Barber from Chicago, stating, in substance, that he had sent to him a letter offering to purchase the entire capital stock of the Home Fire Insurance Company; that he was aware that Barber was the manager, secretary and treasurer of the company, having the management of the same, and owning a major part of the stock, and he would therefore be likely to be able to secure for sale and delivery the entire capital stock; and in consideration of these facts, Funkhauser offered to pay as a bonus and consideration for Barber's efforts in bringing about a sale the sum of $40,000. This proposition was made subject to the acceptance by Barber of another proposition of the same date, and subject to an agreement by Barber, in the event the sale was consummated, not to engage in the insurance business for three years thereafter. On the same day Funkhauser sent to

Barber a letter proposing to buy the entire capital stock of this insurance company for $75,000, subject to the terms and conditions of a certain memorandum of agreement then in the hands of Barber, which conditions are stated in the letter to be that Barber should, when the stock was ready for transfer, make a schedule of the business of the insurance company, which Funkhauser should be permitted to examine and verify. On December 1, 1899, a contract was entered into between the parties; Funkhauser agreeing "to pay in cash to the said Charles J. Barber the sum of $75,000 therefor (the capital stock or options therefor), and in addition thereto, the bonus mentioned and specified in the letter of M. L. C. Funkhauser to the said Charles J. Barber, dated at Chicago, Illinois, and bearing date of the 27th day of November, 1899." Barber, on the other hand, agreed to procure the resignation of the majority of the directors and all of the stockholders of the insurance company. The other matters touched upon in the agreement are not material to this controversy. On and prior to the date of this agreement Mrs. Martin, defendant in error (plaintiff below), was the owner of eighteen shares of the stock of the insurance company. On February 17, 1899, one N. R. Persinger, for Mrs. Martin, who lived at Central City, Nebraska, wrote to Barber with reference to Mrs. Martin's stock, asking if Barber knew "of any one wishing to buy stock, and, if so, at what price." The following day Barber replied to Persinger's letter, stating: "As to value of stock, I can give no figures, as none has changed hands recently. The times have not justified investments of that character. If you would advise me what Mrs. Martin holds her stock for, I will bear it in mind, and should an opportunity present, will try and effect the sale for her. Please have her give bottom figures, as there is but little market for any kind of stock at the present time." On February 22, 1899, Persinger wrote Barber as follows: "I saw Mrs. Martin to-day and she said, if she could get one thousand dollars, and the return of the notes,

for her eighteen shares of stock in the Home Fire Insurance Company, within the next thirty days, she would take it, net to her. She is in need of money, is her reason for this offer." Some time in October, 1899, A. D. Martin, a son of defendant in error, called upon Barber in Omaha. According to him, this visit was for the purpose of ascertaining why certain statements customarily issued to stockholders were not being sent to his mother. His testimony relates, for the most part, to conversations between him and Barber regarding the stock and its value; Barber having stated to him that he was willing to part with his own stock for fifty cents on the dollar; that he was negotiating with eastern parties for the sale of all the stock, and to place him in a position to further this deal, he wanted an option upon the shares held by Mrs. Martin, which, with other options from the other stockholders, was to be placed in an Omaha bank for the purpose of showing the unnamed purchasers that the entire capital stock would be forthcoming. Thereupon A. D. Martin gave Barber the following: "Omaha, October 3, 1899. I hereby give Charles J. Barber an option to purchase eighteen shares of Home Fire Insurance stock owned by me, for the sum of one thousand dollars for a period of sixty days. Mrs. C. M. Martin, per A. D. Martin." Martin at the trial said that he was not told by his mother to do this, and that she did not learn that he had done so until after this suit was commenced, and then through other parties. On November 26, 1899, Barber sent the following telegram to A. D. Martin, who was then in Chicago: "Have offer nine hundred dollars cash for your mother's Home Fire stock. If accepted, deliver immediately through Omaha bank assigned in blank, wire answer." Martin replied by mail as follows on December 4, 1899: "Your telegram offering $900 for mother's stock arrived during my absence from the city, but had left orders for all telegrams to be forwarded to mother at Central City, Nebraska. She writes me she accepted your offer, and immediately forwarded the stock

35

to blank bank in Omaha, and trust by this time same is in your possession. Would be glad to hear from you regarding this matter and wish to thank you for procuring a buyer."

There is much testimony in the record, admitted over objection, explanatory of the two propositions sent to Barber by M. L. C. Funkhauser from Chicago, dated November 27, 1899. From the testimony of M. L. C. Funk-. hauser and one Charles B. Obermeyer, an attorney acting for the Funkhausers, it appears that negotiations with Barber for the sale of the stock of the Home Fire Insurance Company were pending prior to November 25, 1899. There appears of record an unsigned memorandum of agreement between Funkhauser and Barber, providing for the sale of the entire capital stock for a consideration which appears to be cut out of the writing. Shortly after November 25, 1899, M. L. C. Funkhauser and Obermeyer met Barber at the office of Burbank, the attorney for the insurance company at Omaha, for the purpose of going over this memorandum of agreement, to see whether the parties were ready to execute it. Barber interrupted Obermeyer, who was reading the contract, and stated to him and Funkhauser, in the absence of Burbank, who had withdrawn from the room, that he objected to the naming of the consideration in the contract then under consideration, which, from the testimony of Funkhauser, appears to have been $115,000. Funkhauser testified that Barber then requested a proposition in two ways,—the one, of $75,000 for the stock of the company, and the other, of $40,000 as a bonus to Barber; the former to be shown to the stockholders, if necessary; and that they were to know nothing about the difference. In consideration of keeping the actual consideration secret, Barber then offered to agree to keep out of the insurance business for three years. Funkhauser was not ready to accede to this modification of the form of the contract then, but promised to go back to Chicago and think it over. Obermeyer's version of this conversation is substantially as that of Funkhauser.

It is conceded that in the giving of the following instruction the trial court did not err:

"You are instructed that the sole questions for you to determine in this case from the evidence are: (1.) Did the defendant Barber in selling said 18 shares of stock which originally belonged to the plaintiff act as her agent and representative? If he did not, you need not consider the case any further, but return a verdict for defendant. (2.) If you find that he did · act as the agent of plaintiff in selling the 18 shares of stock, you will then determine from the evidence the amount for which said stock was sold by said agent and the amount remaining due the plaintiff and unpaid of said purchase price, and which was received by defendant as agent."

From the evidence adduced it is apparent that the jury believed that Barber was the agent of Mrs. Martin in the sale of the eighteen shares belonging to the latter, and that the consideration received by him was $115 per share, upon the theory that the real consideration paid by Funkhauser for the entire capital stock of the insurance company was $115,000.

Plaintiff in error complains of the admission of certain testimony over objection. Fred Krug, president of the insurance company, and a stockholder, was called by defendant in error. He said that Barber had called him to his (Barber's) office, stating that he intended to sell out the company, having secured a party from outside of Omaha willing to pay $62.50 cash, or $65 if part of the consideration were real estate. Krug thought this price low, under the circumstances, and asked who the party was, to which Barber replied that it was an eastern party. Krug stated that he would not sell at that price unless Barber also got that price, and that every stockholder should get the same price that Barber got, to which Barber replied that he would do the best he could. This conversation occurred the latter part of November, 1899.

On November 26, 1899, Barber sent the telegram to A. D. Martin, stating that he had cash offer of $900 for Mrs.

Martin's stock.  In her petition, defendant in error had
alleged that at that time Barber falsely and fraudulently
concealed from plaintiff the fact that he had received an
offer of $115 a share for her stock, and that on Decem-
ber 2 he did in fact sell her stock for $115 a share.
Krug's testimony was doubtless intended to sustain this
allegation.  The evidence shows, and the jury must have
believed, that on November 25, 1899, Barber had received
a proposition from Funkhauser of $115,000 for the entire
capital stock of the insurance company.  This proposition
was contained in the unsigned memorandum of agreement,
which, according to the testimony heretofore adverted to,
was subsequently altered to meet the request of Barber
for a splitting of the consideration into two parts,—one
for the stock and the other as a bonus.  Krug's testimony
tended to show that at that time Barber concealed from
him, as president of the company and as a stockholder, the
fact that he had such a proposition under consideration.
We think this testimony was admissible.  While it does
not bear directly upon the main issue—whether Barber
concealed from Mrs. Martin, assuming that he was her
agent for the sale of her stock, the fact that he had re-
ceived an offer of $115 per share for her stock—it cer-
tainly shows that he concealed this fact from Krug, a
stockholder similarly situated with Mrs. Martin, and for
whose stock it must also be assumed he had an offer of
$115 under consideration at or about the time he stated
he had an offer of $62.50.  This testimony, while upon a
collateral issue, can not for that reason be conclusively
said to be irrelevant.  It certainly formed the basis of
a reasonable inference of the main issue of concealment
of the offer of $115 for the shares of defendant in error
at the time he stated he had an offer of $900 for her shares.
*Lincoln Vitrified Paving & Pressed Brick Co. v. Buckner,*
39 Nebr., 83; *Remy v. Olds,** 21 L. R. A. [Cal.], 645.  As-

* This case has an interesting note on the act of God as affecting
the obligation to perform a contract, that is to say, an intervening,
insurmountable impediment, resulting from the operation of nature,
which could not have been contemplated by the parties.—W. F. B.

suming for the present that he was her agent for the sale of the stock, and that he did have an offer of $115 at the time he stated by telegram that he had an offer of $900, the fact that he concealed from her the real consideration offered for her stock must be taken as established; and in such event, Krug's testimony, even if of doubtful character, would not warrant a reversal of the judgment. But we think it was clearly admissible, as relating to facts and acts related in point of time and character to the main issue of fraudulent concealment from defendant in error. What has been said upon this contention is equally applicable to the testimony of several other witnesses, also stockholders in the company, who at the trial gave testimony substantially like that by Krug.

Complaint is made of the admission of the testimony of M. F. Funkhauser, tending to show that in the negotiations preceding the written contract finally executed between the parties for the sale of the stock to Funkhauser, the price offered was $115 a share. Objection was made on the ground that negotiations preceding and leading up to a contract finally reduced to writing are merged therein, and that as long as the contract remains unimpeached on the ground of fraud or mistake, parol testimony of prior or contemporanous conditions can not be received to vary the terms of the writing. *Commercial State Bank of Neligh v. Antelope County,* 48 Nebr., 496.

Counsel for plaintiff in error offered to show that the contract was in writing, to lay the foundation for objection. The offer was refused and the testimony admitted. We understand that it is conceded that the rule referred to does not apply, except to the parties to the contract or their privies. *National Car & Locomotive Builder v. Cyclone Steam Snow Plow Co.,* 49 Minn., 125; *Clerihew v. West Side Bank,* 50 Minn., 538; *Reynolds v. Magness,* 2 Ired. Law [24 N. Car.], 26; *Lee v. Adsit,* 37 N. Y., 78; Wharton, Evidence [3d ed.], secs, 923, 1041, 1042, 1078. But counsel seek to obviate the applicability of this exception by saying that the contract between **Barber and**

Funkhauser was, according to defendant in error's own theory, so far as it embraced her shares, made by Barber as her agent, and that she was, therefore, upon the theory of her case, privy to the contract. We think that this contention is based in a misconception of the relation of the parties to this action. This is not an action by Mrs. Martin against the Funkhausers upon a contract made by her agent upon her behalf. In such event, doubtless, in the absence of a proper issue, parol testimony varying the contract would have been excluded. On the contrary, this is an action by the principal against her agent to recover the profit made by the agent in a transaction affecting the principal's property, and which, under the law, he had no right to keep. Being the agent of Mrs. Martin for the sale of her stock, the question was, what in fact was the consideration received by him for the stock? If that consideration was in fact $115 per share, and the contract by which the shares were sold had been, upon his suggestion, made to recite a false consideration, the law would be justly charged with holding out inducements to agents to be dishonest, if it should be held that such contract would estop the principal, as against the agent, on the question of consideration. This testimony was, therefore, admissible.

M. L. C. Funkhauser was permitted to narrate in detail the negotiations between him and Barber which culminated in the sale, and his testimony was to the effect that the consideration for the capital stock, as first proposed, was $115,000, and that upon the request of Barber, for reasons already referred to, the proposition was made in two parts—one for the stock and the other as a bonus. The objection to this testimony is the same as that urged to the testimony of M. F. Funkhauser, and has already been disposed of adversely to plaintiff in error.

The trial court refused to permit Funkhauser and Obermeyer, upon cross-examination by counsel for plaintiff in error, to say what they would have given for the shares without the resignation of Barber, or whether they would

have given $115 per share for less than all or less than a major part of the capital stock.

Before passing upon this contention, we will consider another question presented by counsel for plaintiff in error, and intimately connected therewith. It is said that the verdict giving to Mrs. Martin the difference between what she actually received for her stock and $115 enables her to participate in a consideration which came to Barber because of a surrender by him of rights and benefits belonging exclusively to him. His agreement was to refrain from engaging in the insurance business for three years, surrendering a salary as manager and secretary of the Home Fire Insurance Company, in an amount not shown by the record, but placed by counsel at a sum not less than $10,000 per annum. These benefits, it is claimed, entitle Barber to compensation in which Mrs. Martin can not of right participate. It is further suggested that his work in procuring the resignation of a majority of the directors, and in inducing the holders of outstanding stock to sell, which are among the premises constituting the stated consideration of the $40,000 bonus, gives him an indisputable right to appropriate the $40,000 bonus to himself. Whether, in the absence of all fraud or misrepresentation, Barber would be entitled to a personal compensation for his agreement to stay out of the insurance business for three years, need not be decided. Such an agreement was upheld in *Bristol v. Scranton*, 11 C. C. A., 144, 63 Fed. Rep., 218, 221, but upon a ground which distinguishes it from the case at bar: "In our opinion," it is there stated, "the transaction, as consummated, so far as the consolidation of these two companies is concerned, is not tainted by a scintilla of fraud on the part of the defendants. It was conducted openly and fairly; was brought in its earlier and later stages to the knowledge of a very large number, if not all, the stockholders interested, who were represented by the defendants; and the terms of the consolidation, as finally agreed upon, **when submitted to the stockholders of the Scranton Com-**

pany, including the complainants, was approved, not only with entire unanimity, but as well as a great 'triumph.' " It can not be said, under the evidence and the verdict in the case at bar, that Barber's conduct was free from fraud and concealment. Barber, as general manager and secretary, as well as director, bore a trust relation to Mrs. Martin, as well as to all other stockholders, which continued so long as he remained an officer of the company. It is primary knowledge that corporation business is transacted through managing officers. The relation between officer and stockholder is that of trustee and *cestui que trust*. The officer can not use the confidence reposed in him for personal profit. If his conduct is impeached and brought under review, it will be closely scrutinized. The burden was upon Barber to show that he had dealt fairly with the stockholders, and he was inhibited by every rule of equity and fairness from taking to himself the benefit of a transaction, if that benefit was inconsistent with the faithful discharge of his trust. As stated in *Bristol v. Scranton, supra* (p. 221): "It is a rule of the broadest application in equity that no one who has fiduciary duties to discharge shall be permitted to enter into contracts or engagements, in which he has a personal interest, which actually do conflict or may conflict with the interest which he represents, and which he is bound to protect. To uphold such proceedings,—to justify such conduct,—would be contrary to public policy. The law does not permit fiduciary agents to subject themselves to temptations to serve their own interest in preference to those of their principal. An agent's interest and an agent's duty must be coterminous and harmonious. These principles are perfectly well settled." Under the evidence the jury was justified in finding, and may be presumed to have found, that Barber was offered $115 per share for all the stock, and that upon his suggestion the contract was made to show a consideration of $75 per share. He had no right to assume that Mrs. Martin or any other stockholder would be willing to take less than the largest

offer obtainable; and by concealing the actual offer, he was enabled to reap a profit which rightfully belonged to Mrs. Martin. In *Cumberland Coal and Iron Co. v. Parish,* 42 Md., 598, it is said (p. 605) that in the case of directors of a corporation, "there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the share-holders, but that they will in no manner use their posi-tions to advance their own individual interest as distin-guished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty." The court says further that the burden of proof is upon a party holding a confidential or fiduciary relation to establish the perfect fairness, adequacy and equity of a transaction with the party with whom he holds such relation; and that, too, by proof entirely independent of the instrument under which he claims. *Bent v. Priest,* 86 Mo., 475. It follows that Barber could not legally make a profit out of the sale of Mrs. Martin's stock, in the ab-sence of a clear showing that it was the latter's intention to sell to him, as the vendee of her stock, for a price agreed upon between them, after which the stock would be his. But Barber never pretended to buy the stock. In no event did he make an offer to purchase it. The telegram under which the stock was sent to the bank for delivery ex-pressly stated that he had received an offer of $900. This could mean nothing to Mrs. Martin except that Barber was in a position to sell her stock for her at that price. It nowhere appears that he had received an offer of $900. On the contrary, it is amply proved by the record that he had received a much higher offer. He made no disclosure of this higher offer. His conduct was not free from fraud or concealment. He used the confidence reposed in him for his personal profit.

It was the theory of counsel for plaintiff in error that Funkhauser offered a bonus of $40,000 in good faith to secure the consummation of the transfer of all the stock, and the resignation of a majority of the directors. Hence,

on cross-examination of Funkhauser and Obermeyer, as already indicated, it was sought to be shown that they would not have paid $115 per share without the resignation of a majority of the directors, or for less than a major part of the stock.   Was the exclusion of this testimony erroneous?   The record, we think, shows conclusively that Funkhauser and his associates never proposed to buy less than all of the capital stock of the company.   From the very commencement of the negotiations, the parties considered only the proposition of the transfer of all the stock.   The question was, what did they pay for it?   It follows, therefore, that it was immaterial what they would have paid a share for·less than the entire capital stock, and the ruling of the trial court was not erroneous.   In this connection, it should also be remembered that Barber was not entitled, as against Mrs. Martin, to enjoy a secret compensation from Funkhauser for effectuating the contract.   It is elementary that the agent for one party can not appropriate to himself a fee paid by the other party to the contract for bringing about the contract; and we can not see how his liability in this could be affected, even if it were shown that the price paid a share by Funkhauser was governed by the consideration of Barber's services in bringing about a sale of all the stock. If it was his duty, as manager and director, to manage the affairs of the corporation for the benefit of Mrs. Martin and the other stockholders, it was equally his duty, in making a sale of the company, to remain aloof from any temptation to make such sale profitable to him personally at the expense of the shareholders.

So far we have considered this case upon the assumption that Barber, in the sale of the stock, acted as agent for Mrs. Martin, defendant in error.   It is earnestly contended on behalf of plaintiff in error that the trial court's rulings upon the evidence tendered for the purpose of proving agency in Barber are erroneous, requiring a reversal of this judgment.   We have read the record, and are convinced that under the evidence upon this issue,

which was clearly admissible, the jury was manifestly justified in believing that Barber was Mrs. Martin's agent for the sale of her stock; that both he and she so regarded him. He stated to her that he had an offer of $900. He admits that he never had such offer. In his testimony, which appears in the record by deposition, he says, in answer to a question why he stated that he had an offer of $900 if in fact he was buying the stock himself: "For the simple and sole reason that I didn't propose to be bound to take their stock if my negotiations with Funkhauser fell through, which I would have been bound to have done had I made a stated offer."

Q. Well, do you mean that Funkhauser had offered you $900 for the stock?

A. No, sir; I do not.

Q. Well, who was making you an offer?

A. No one.

Q. Why did you say, "Have offer $900"?

A. I have simply said why I have used that language; so I could not be held and be compelled to take the stock and pay $900 for it if my negotiations fell through. I did not want the stock at any price, and I should have repudiated taking the stock had my negotiations fallen through.

Thus Barber's own testimony accords with that given by A. D. Martin, to the effect that Barber cried the stock down, saying that he would take fifty cents on the dollar for his own. It also appears from his testimony that he was considering Funkhauser's proposition when he telegraphed to Mrs. Martin's son that he had an offer of $900. A. D. Martin testified that he gave Barber the option to sell at $1,000 for sixty days, already referred to, upon Barber's suggestion, in order that the latter might show it to eastern purchasers. There is some question made of A. D. Martin's power to deal for his mother. But this is not material in this connection. There is no suggestion from Barber that he doubted Martin's authority. It conclusively appears that he led A. D. Martin to believe that he

himself would not give $1,000 for the stock under any circumstances. It is equally clear that he concealed from A. D. Martin Funkhauser's identity, and the negotiations for the sale of the stock then under consideration between himself and Funkhauser. All of this was inconsistent with Barber's trust relation as manager and director of the company, and at the same time amply shows that he intended the Martins to believe that he would not and was not buying the stock himself, but was undertaking to sell it for them.

Error is urged in the admission in evidence of the three letters heretofore quoted, dated February 17, 18 and 22, 1899, respectively; the first and third from Persinger to Barber, and the second from Barber to Persinger, relative to Martin's stock. In the letter of the 17th, Persinger asks Barber if he knows of any one wishing to buy Mrs. Martin's stock, and if so, at what price. In his answer, Barber asked to be advised at what price Mrs. Martin held her stock, saying that he would bear it in mind, and should an opportunity present, he would try to effect a sale for her. Replying to this letter on the 22d, Persinger says that he had seen Mrs. Martin, who said if she could get $1,000 for her shares within the next thirty days she would take it, net to her; her need of money being the reason for this offer. Counsel contend that these three letters constitute a contract, which by its terms expires within thirty days from February 22, and therefore can not be relevant to the issue whether a contract existed ten months later. Counsel for defendant in error contends that the intent of the parties, gathered alone from these several writings, warrants the conclusion that the limitation of time in the letter of February 22 to Barber applies only to the latter's authority to sell Mrs. Martin's stock for $1,000, and that the offer of Barber to try to effect a sale, should an opportunity present itself, was a continuing offer, and was never revoked. The trial court evidently adopted the view of defendant in error, and we are unable to say that, by adopting this contention,

error was committed. We are of the opinion that the parties themselves understood—an understanding evidenced by the letters, as well as much other evidence in the record—that the offer of Barber to effect a sale of Mrs. Martin's stock, if he could do so, was a continuing offer, and that the limitation of thirty days was upon the authority to sell for $1,000, and that thereafter he was agent to negotiate a sale at a price acceptable to Mrs. Martin. Barber himself evidently put this construction upon the status of the parties when he telegraphed to Mrs. Martin's son that he had an offer for the stock. He made no inquiry whether she wanted to sell, but simply submitted to her an offer for her approval. In determining the question whether Barber was Mrs. Martin's agent, the jury had a right to know all the circumstances surrounding the transactions, and these letters were material for the purpose of establishing agency. It is apparent from the conversation between A. D. Martin and Barber that both understood that Barber was attempting to find a purchaser for Mrs. Martin's stock. As already stated, the telegram stating he had an offer of $900 is a circumstance tending to show that he understood that he was the agent for the sale of the stock at a price subject to her approval. We think the letters were competent evidence to establish agency.

A similar objection is made to the admission in evidence of the letter sent by A. D. Martin to Barber in reply to the telegram Barber sent to Martin announcing that he had an offer for the stock, and in which A. D. Martin says: "Wish to thank you for procuring a buyer." We think this letter was properly received in evidence, for the reason given above, justifying the admission of the other letters, and for the reason that it tended to show that Barber was not himself the purchaser of the stock.

The conclusion we have reached as to these letters disposes of the assignment based on the refusal of the trial court to give an instruction withdrawing from the jury's consideration these letters, as not tending to establish

agency, and that contention need be considered no further.

Complaint is made of an instruction given by the court, stating, in substance, that if the defendant was by the jury found to be plaintiff's agent, and if by concealments he induced her to accept but $900 for her shares, when in fact he obtained a larger sum, he would be liable for the difference. We can not see how this was prejudicial to the rights of plaintiff in error.

The requested instruction of plaintiff in error numbered 2 was to the effect that in case the jury found for plaintiff upon the issue of agency, her recovery must be limited to the difference between the amount she had actually received, namely, $50 a share, and $75, or $25 a share on her eighteen shares. This instruction was upon the theory that defendant in error was bound by the consideration of $75,000 stated in the contract between Barber and Funkhauser. We have already disposed of this contention adversely to plaintiff in error.

We have given careful consideration to the several questions raised by the record, presented—and ably presented—by counsel in briefs and argument; and we believe that the verdict is amply sustained by competent evidence, and that the judgment of the trial court thereon is free from error, and is right, and it is therefore recommended that the same be affirmed.

HASTINGS, C., concurs.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.