WILLIAM B. PRICE, APPELLANT, V. WILLIAM A. FRASER ET AL., APPELLEES.

FILED MAY 29, 1930.   No. 27004.

W. B. Price, C. J. Campbell, John M. Stewart, Don W. Stewart, John P. Breen and G. E. Hager, for appellant.

Mullen & Morrissey, Morsman & Maxwell, Brogan, Ellick & Raymond, De E. Bradshaw, J. M. Sturdevant, Calfee, Fogg & White and Chapman, Cutler & Parker, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

DAY, J.

This is an action in equity brought by the plaintiff, on behalf of himself and other members of the Sovereign Camp of the Woodmen of the World, to set aside certain leases and conveyances relating to its home office building, and to quiet title in the association in the same, for that they were fraudulently made by defendants. Plaintiff appeals from a decree in favor of defendants.

The defendant Sovereign Camp of the Woodmen of the World is an incorporated fraternal beneficiary association of Nebraska, and the defendants William A. Fraser, John T. Yates, and De E. Bradshaw are, respectively, its Sovereign Commander, Sovereign Clerk, and general counsel. The defendant Woodmen Building Corporation is a Nebraska corporation which was organized by defendant Byllesby & Company as a holding company and which secured by a circuitous route through defendant William H. Short a 99-year lease upon the property in question from the Woodmen of the World Life Insurance Association for $1,000,000 cash and an annual rental of $44,000 a year. This lease was made to defendant Short as trustee and

assigned by him to the building company. Shortly thereafter the building company secured an option to purchase the fee to said real estate. Simultaneously with the execution of the 99-year lease, another lease was executed by the building company to the life insurance association, leasing for a period of 8 years at an annual rental of $112,668 the quarters occupied by them in said building. This lease was coincident with, and a part of, the 99-year lease. The defendant Continental and Commercial Trust and Savings Bank and William P. Kopf are trustees by mortgage deed from the building company upon its 99-year leasehold. One million, one hundred and twenty-five dollars in bonds were issued, which are secured by this mortgage deed. The defendant Guardian Trust Company is trustee of the fee title by virtue of a deed to it from defendant Albert J. Twerell, who took the title to the fee from the life insurance association. A declaration of trust was issued by the Guardian Trust Company by which it declared that it had issued land trust certificates in the nature of mortgage bonds, totaling $700,000. The plaintiff alleges in his petition that the transfers and lease were fraudulent, *ultra vires,* and void, as against the plaintiff and other members of the association. He asks the court to set aside and cancel the deed from the life insurance association to Twerell as trustee, the deed from Twerell to the Guardian Trust Company, the declaration of trust of the Guardian Trust Company, the option of the building company to purchase, the 99-year lease by the life insurance association to Short as trustee, and its assignment by him to the building company, and the 8-year lease from the building company to the life insurance association.

The trial court found for the defendants upon all the issues. It found that the various leases and conveyances of said property were each and all made upon adequate consideration, and in good faith and without fraud; that they were made in conformance to the statutes of the state of Nebraska, and the articles of incorporation of the Sovereign Camp of the Woodmen of the World; that the charges of fraud and wrongdoing made by plaintiff relative to these

transactions were not sustained by the evidence, and that his petition should therefore be dismissed.

This skeleton outline of the case will enable us to better understand the issues. We purpose to consider this transaction step by step; to analyze the testimony relative to each transaction; to determine with deliberation the effect of each detail upon our ultimate conclusion and thus to arrive at our judgment by a trial *de novo* from the record in this case.

Let us first consider and discuss whether the various leases and conveyances were made in conformance to the statutes of the state of Nebraska and the articles of incorporation of the Sovereign Camp of the Woodmen of the World. Mr. Fraser negotiated the 99-year lease on the property with Byllesby & Company, investment bankers of Chicago. It would perhaps be helpful to follow through the history of this transaction. It indicates a prolonged and persistent effort on the part of Mr. Fraser to dispose of this property. At a special session of the executive council, held at San Antonio, Texas, April 5, 1926, he reported as follows:

"Our Building In Omaha.

"For some considerable time I have been convinced that if we could dispose of our Woodmen of the World building in Omaha, at a reasonable price, it would be to the interests of the organization in general. During all of 1925 I had been investigating the prospects of a sale to some of the institutions in Chicago which promote large real estate transactions, but I found it difficult to interest any of them when the discussion came to selling buildings outside of Chicago."

While there is no record that the executive council directed such activity on the part of the Sovereign Commander, there is also no record of any opposition to it. Coupled with the subsequent approval of the various transactions involved in the leasing and sale of the property, we are driven to the conclusion that it had at least the tacit approval of the council. First, Fraser negotiated a sale of the property for $1,610,000 to a representative of A. C. Allyn

& Company of Chicago. This sale was not consummated because Allyn & Company after an inspection and examination refused. Thereupon Fraser negotiated the controversial lease. The lease was made and delivered to one Short, who took it as agent and trustee for Byllesby & Company. This tentative lease was presented to a called meeting of the executive council in Chicago, Illinois, on February 23, 1926. The minutes of the meeting show that Sovereign Commander Fraser presented a proposition from William H. Short, offering to lease the Woodmen of The World building at Omaha, Nebraska, for a period of 99 years, and to pay for said lease $1,000,000 in cash and $44,000 each year for 99 years, payable semiannually. Then follows a resolution authorizing Fraser and Yates "to make any lease, sale, or other disposition of the real estate and buildings thereon belonging to the society," and providing: "We hereby ratify and confirm the action of said officers in such sale or lease or other disposition thereof." Then followed another resolution of similar purport, by which Fraser and Yates were "authorized, empowered and directed" to execute and deliver, for and on behalf of the Sovereign Camp of the Woodmen of the World, a lease to said land and buildings to William H. Short. Pursuant to this authorization, the officers of the Woodmen of the World executed and delivered the 99-year lease to Short. The Woodmen of the World is incorporated under the laws of the state of Nebraska as a fraternal beneficiary society. Therefore, the power of the Woodmen of the World to dispose of this property must depend upon the statutes of the state of Nebraska and its articles of incorporation. Its articles of incorporation, as last amended, October 2, 1917, and in this particular are substantially identical with the original, provide: "It shall have the power to purchase and hold such real and personal property as shall be necessary for its convenience and use, and may sell, transfer or dispose of the same, as it may deem necessary." It seems that the ordinary meaning of this language is to authorize the society to dispose of its property when it may deem necessary through its regular and legally constituted ma-

chinery for the management of its affairs. The constitution and by-laws of the society, filed in the office of the secretary of trade and commerce, pursuant to the provisions of section 7927, Comp. St. 1922, and in effect in 1926, provide, in section 2, that the Sovereign Camp, among its enumerated powers and duties, "shall have generally such powers and may perform such duties as it may deem wise for the welfare of the association." Section 26 provides that all power and authority of the Sovereign Camp, when not in session, shall be vested in the Sovereign Executive Council. Section 27 provides that the Sovereign Executive Council shall have general supervision and control of all buildings and real estate of the association. Tested by the articles of incorporation and the constitution and by-laws of the association, the executive council would seem to have the power and the authority to execute the 99-year lease.

It is further urged by the officers of the Woodmen of the World that the act of the executive council was ratified by the Sovereign Camp at its meeting at Los Angeles in June, 1927. This, they say, ought to end the controversy. We are not of that opinion. Under the powers conferred upon the executive council by the articles of incorporation and the constitution and by-laws of this fraternal society, this ratification was unnecessary. A failure or refusal to ratify would not of itself have invalidated the lease. Likewise, such a ratification would not validate a lease fraudulently executed, but would only draw the Sovereign Camp itself into the fraudulent transaction. The power and authority of the Sovereign Camp is the same and only exceeded, or rather superseded, that of the executive council, while the former is in session, which is only for short and infrequent intervals. It is also true that the ratification of said Sovereign Camp would not improve nor transform an *ultra vires* act of the association. If such a transaction was *ultra vires* if ratified by the Sovereign Camp, or even if executed at the direction of the Sovereign Camp itself, it would still be *ultra vires* even if executed by the executive council. Further, it may be noted in passing that the findings of fact made by the Sovereign Camp, at the time of

the so-called ratification, are not impressive. It might be said that it resolved itself into a popularity contest between William A. Fraser, Sovereign Commander, and William B. Price, the member who brought this action, with the former exercising an unusually unfair advantage in that he was personally present and directing the proceeding. It might be said that it is apparent from the record that the investigation was superficial and that its action was taken without a full knowledge of the facts. The minutes of the meeting raise a suspicion that perhaps there was too much fraternal back-slapping, and not that serious businesslike consideration the magnitude of the affairs of this great fraternal beneficiary society deserves. Without pointing out in detail the fallacies and weaknesses of the judgment of the Sovereign Camp, suffice it to say that, as far as this court is concerned, the transaction must stand or fall independently of, and without reference to, that ratification.

But, argues the plaintiff, "the limited scope of the business of such an association is definitely fixed by statute." Chapter 120, Laws 1925, provides that a fraternal beneficiary society is "organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit." It is then argued that the leasing of this the largest office building in the state of Nebraska for a period of 99 years is not within the objects and purposes of the association; that it is in fact a commercial transaction that transcends its objects and purposes. It occurs to us that this might with equal force be applied to the leasing of the building, only a relatively small part of which was occupied for its own use, to many tenants, as has been its custom from the date of its erection. It is also suggested that, in view of the decision of this court in *Folts v. Globe Life Ins. Co.*, 117 Neb. 723, there is serious question whether the Woodmen of the World did not exceed its authority in erecting a building, the larger part of which was rented to tenants. Necessity not requiring us to pass upon that question here, we refrain from so doing. We must consider the situation as presented to us. If the Woodmen of the World had the power to own this property, it also had

the power to dispose of it. In *Tash v. Ludden,* 88 Neb. 292, this court stated the law of this state to be as follows:

"All corporations capable of taking and holding property have the *jus disponendi* as fully as natural persons, except so far as they are restrained by statute, or are prohibited by their articles of incorporation or outstanding contracts; and under this general power a corporation may dispose of the whole of its property for any lawful purpose."

On the other hand, if the association had not the power to acquire the property, then it has no power to hold it, and it would be required to dispose of it. If the Woodmen of the World was about to engage in the erection of such a building, we might consider these arguments; but, since it is the disposition of the property, the plaintiff is caught on the horns of the dilemma of his own argument, for the 99-year lease was a portion of the whole transaction, the object of which was the ultimate disposal of all the right, title and interest of the Woodmen of the World in the property. The lease for 8 years by the insurance society of its quarters was coincident with, and a part of, the transaction. There can be no question about the right and power of the society to lease quarters for its necessary uses and conveniences. The only other conveyance involved is that of the fee title which was subsequently executed. By the 99-year lease and the sale of the fee, the Woodmen of the World divested itself of all title and interest in this property. It was, in truth and in fact, a sale of the property. We conclude that the trial court very properly found that the various leases and conveyances of said property were each and all made in conformance to the statutes of the state of Nebraska and the articles of incorporation of the Sovereign Camp of the Woodmen of the World.

We now come to a consideration of the plaintiff's contention that the lease and sale of the property were fraudulently made by the officers of the life insurance association. An examination of the petition filed herein reveals that the plaintiff charges therein that the acts of defendants Fraser, Yates, and Bradshaw were with intent to cheat and defraud the Woodmen of the World, and its members, and with the

unlawful and fraudulent purpose of procuring for their own benefit and profit the possession, control, and ownership of said real estate, for a grossly inadequate consideration, and of procuring for their own benefit and profit control of the defendant's assets and business in violation of their duties and the trust reposed in them by the Woodmen of the World. The further charge is made that the different transactions involved herein were negotiated for the benefit of the financial interest of these parties to the suit. We have carefully scanned the voluminous record in this case with a single eye to the discovery of direct evidence of the personal, beneficial, financial interest of the parties. We are sure that the record justifies the statement that it contains no such direct unequivocal evidence of personal interest or fraud on the part of the officers. The brief of the plaintiff was disappointing in that under the heading of facts and circumstance showing fraud it does not direct our attention to such evidence. In fact, the evidence is quite the contrary. Under oath, in the trial of this case, Fraser, Yates, and Bradshaw all testified that they had no such interest in the transaction, and acted only for, and on behalf of, the Woodmen of the World Life Insurance Association. In the same manner, every man connected in any way with these transactions testified as to his personal financial lack of interest. Consequently, this charge in the petition is not sustained by any direct evidence in the record which would justify the finding of fact by the court that the sale and leases of this property were fraudulently made by the officers because of their personal interest.

But they urge that these defendants caused to be organized the defendant Woodmen Building Corporation which became in the first instance the owner of the 99-year lease on said property. They charge that a majority of the stock of said corporation is, and has been at all times, owned and controlled by the defendants Fraser, Yates, and Bradshaw, and that it was organized to conceal their interest and participation in the transactions under consideration. The testimony in the record relative to this phase is that Mr. Fraser negotiated with Byllesby & Company, investment

bankers, through one Mather for the 99-year lease. When this transaction was consummated, they took the lease in the name of one Short, who held as trustee, and Byllesby & Company caused the Woodmen Building Company to be organized as a holding company for the Woodmen of the World building. When organized, the leasehold interest was assigned to it. Fraser and Bradshaw became at least nominal directors and officers in the new-born corporation. So also did one Crawford, who had been manager of the building for the Woodmen of the World, and who was continued in this position by the new owner and ceased to be an employee of the Woodmen of the World. Crawford was an employee and not an officer of the Woodmen of the World. Crawford was given 500 shares of stock in the new company. The only asset of the company was this leasehold interest subject to a mortgage to secure the bonds issued by the company. The stock was therefore of doubtful value, or at least of remote value. The testimony is that the stock was given him to stimulate his interest for that careful and energetic management might give it some value in the far distant future. Since there is no evidence that Crawford's interest is in any way connected with that of Fraser and Bradshaw, and since he was not an officer of the Woodmen of the World and did not have any connection with the lease and sale of the property, it is unnecessary to consider him further.

We will now direct our attention to Bradshaw, who was not an officer of the Woodmen of the World, but was its general attorney. The relationship existing between Bradshaw and the Woodmen of the World was therefore that of attorney and client. He took no part in the negotiations for the 99-year lease. He was present at the meeting of the executive council, when the lease was authorized, and prepared the resolution empowering the officers to execute the same. However, most of the instruments necessary were prepared by attorneys for Byllesby & Company. Later he became at least a nominal director and an officer of the building company, although he had no obvious and direct part in the organization. There is testimony, which is not

disputed, that he became such director and officer reluctantly and performed few, if any, duties as such. He did not pay for the one share of stock issued to him and he immediately assigned it back. The purpose of having him an officer, as explained by the defendants, was to furnish the proper "sales scenery" for the bonds which had been issued. It was thought that it would establish public confidence to have as officers men known to have been connected with the Woodmen of the World and thus facilitate the sale of the bonds. The Woodmen of the World was to a certain extent interested in the sale of these bonds. It had the desire to dispose of all its right, title and interest in this property. It still owned the fee title and through the lease was to receive $44,000 a year rental. It seemed important to have these bonds successfully marketed before it proceeded to sell the fee title. There is neither direct nor circumstantial record evidence tending to prove that Bradshaw negotiated the deal, or that he conspired with others to defraud the Woodmen of the World, or that he personally derived any financial profit from it, or that he, as attorney for the Woodmen of the World, acted fraudulently.

The other member of the trio charged by plaintiff with defrauding the Woodmen of the World is Fraser, the Sovereign Commander or chief executive officer of the life insurance association. As chief executive officer, he negotiated the leases, as well as the sale of the fee title. He called the meeting of executive council, recommended, asked and secured its approval and authorization of the deal. Stripped of the polite language of the parties, he is charged with having conspired to sell the building for an inadequate consideration that he might profit personally thereby. The record discloses that the sale of this building had become an obsession with him. The plaintiff assigns various reasons for this. Fraser gives others, which are plausible, if true. The reasons given by him to justify the sale of the property are that it is now unsuitable as a home for the order, in that the vault is insufficient and cannot be enlarged except at an exhorbitant expense; that the present income and future earning prospects are insufficient to

make a good investment; that although when built the location was a retail district with most of the leading financial institutions of the city, the business district has now moved to the west, with its retail stores and banks; that it has been impossible to rent the store rooms in the building to profitable tenants. These reasons are also supported by the testimony of witnesses as to the value of the property. While we have detailed these transactions almost to the extent of boredom, let us again examine them relative to Fraser's connection. He negotiated the 99-year lease; he secured the approval of the executive council; he executed the 8-year lease for quarters for the life insurance association, which we will discuss in detail in connection with the adequacy of the consideration; and later negotiated and secured the approval of the executive council and the ratification of the Sovereign Camp. In order to find for plaintiff upon this allegation in his petition, the evidence must be found in the record proving that Fraser entered into a conspiracy to sell the property for an inadequate consideration and as a result he received a financial consideration either of money or its equivalent. There is no direct evidence in the record to support the charge that Fraser was guilty of fraud and wrongdoing in these transactions.

But the plaintiff contends that, since Fraser was a member of the board of directors of the building company and an officer and director of the Woodmen of the World, these transactions between corporations having common officers and directors are presumptively fraudulent, and the burden is on the defendants to sustain the transaction by clear and convincing evidence that it was fair. We find no fault with the authorities cited and recognize the rule contended for as the law of this state reflected by an unbroken line of decisions, including *Fitzgerald v. Fitzgerald & Mallory Construction Co.*, 44 Neb. 463; *McLeod v. Lincoln Medical College*, 69 Neb. 550; *Grand Island Gas Co. v. West*, 28 Neb. 852; *City Trust Co. v. Bankers Mortgage Loan Co.*, 102 Neb. 532. See, also, *Geddes v. Anaconda Copper Mining Co.*, 254 U. S. 590, 599; 4 Fletcher, Cyclopedia, Corporations, sec. 2377.

But, again, when we examine the evidence in this case, we find that it falls far short of establishing the facts in this connection upon which the plaintiff relies. In the first place, the proof establishes that this 99-year lease was negotiated and consummated with Byllesby & Company, and that at all times thereafter they exercised domination and control over it. At that time the building corporation was not born and the title was held by Short as trustee for Byllesby & Company. The 8-year lease by the Woodmen of the World for the quarters occupied by it was executed coincident with, and as a part of, the 99-year lease. Therefore, as to these two transactions the rule is not applicable, since these two transactions were not negotiated by and between two corporations having common directors and officers. It is undisputed that Byllesby & Company, the investment bankers who disposed of the bonds, zealously guarded their control and management of the property for the purpose, as given by them, that they might protect the purchasers of the bonds, toward whom they recognized their responsibility. To this end, they retained a majority of the stock in the building company. It appears that Fraser was issued one share of stock, which he immediately reassigned. Upon this share of stock, which was reassigned, he was elected a director and officer of the corporation. He never participated in any meeting of the Woodmen Building Corporation, and particularly did not participate in any meeting which considered the acquisition of the option to purchase the fee to said building. He was never a regular stockholder, having a financial interest in the corporation. The only transaction that could be questioned because Fraser was a director of the Woodmen of the World and the building corporation was the sale of the fee. But this deal was between Woodmen of the World and Byllesby & Company. Fraser was not a director of Byllesby & Company. After their purchase the fee ran to the building corporation. They organized the Woodmen Building Corporation as a holding company for this property and all their interest in it was centered and controlled by it as a subsidiary. The foregoing facts

are testified to by all the witnesses who testify as to the circumstances involved in and surrounding these transactions. The conclusion is amply justified by the evidence that Fraser, as an officer and director of the Woodmen Building Corporation, was just another "set up" used by Byllesby & Company to properly set the stage for the sale of bonds, and that as such an officer he served no other useful purpose. To conclude, these transactions between the Woodmen of the World and the Woodmen Building Corporation were not between two corporations controlled and directed by the same officers and directors. Even if they were, the court would not set them aside if they were fair, and fairness in this case depends upon the adequacy of the consideration. While the court will closely examine for possibility of fraud transactions where the directors of a corporation which purchases property are also directors in the corporation which sells the same, such sale, however, is not unlawful and not void, but voidable only, and will be set aside only after a finding that the financial interest of such directors are such that they could not have honestly performed their duties as directors of the selling corporation. Such a sale will not, then, be set aside if made in good faith and for an adequate consideration. *City Trust Co. v. Bankers Mortgage Loan Co.,* 102 Neb. 532; 14 C. J. 125; 7 R. C. L. 461, sec. 444.

We have concluded that there is no direct evidence tending to prove the charges of fraud contained in the plaintiff's petition, but he argues strenuously and with apparent conviction that there are facts and circumstances which justify the inference of fraud. We have already discussed Fraser's connection with the deal, his negotiation of the 99-year lease and subsequent approval of the executive council; his connection with the Woodmen Building Corporation. We will now discuss the adequacy of the consideration for the sale of the building. In this connection we will consider the 99-year lease, the 8-year lease, and the sale of the fee as a single transaction for the disposition of the property. The defendants contend that all these transactions involved the Woodmen of the World

only to the extent that it executed a 99-year lease to one Short, and then sold the fee to Byllesby & Company, and at their direction conveyed title to one Twerell, and that all other and succeeding transactions were means employed by the lessee and grantee respectively to finance their investment. The elaborate and complicated machinery set up and employed to accomplish this simple transaction may well be expected to cause at least temporary misunderstanding and confusion. For the 99-year lease the Woodmen of the World received $1,000,000 and $44,000 a year rental. As heretofore stated, this lease was negotiated with Byllesby & Company, taken by Short in trust for them, and finally assigned to the Woodmen Building Corporation, which issued bonds to the extent of $1,125,000 to pay for said lease and promotion expenses. Examining the 8-year lease which the Woodmen of the World gave to the building corporation, we find that the Woodmen of the World had maintained a system of accounting while owning the building, in which they charged themselves a certain rental for the quarters occupied by them, which was in excess of the rental paid by other tenants for similar space. This fact was known or could have been ascertained by every member of the executive council, Sovereign Camp, and of the order. This went into the annual report of the building and the statement of the net income derived from the building. The tendency of this method of accounting made the building look more attractive as an investment than actual facts justify. It was the statement exhibited to Byllesby & Company at the time of the negotiation of the 99-year lease. When Byllesby & Company discovered this, they insisted that the Woodmen of the World should enter into a lease at that rental for a term of years or they would not go through with the deal. It probably amounted to an unintentional misrepresentation of a material fact as to the income of the building. Finally, as a part of the 99-year lease transaction, the Woodman of the World executed the said lease for a period of 8 years at what is conceded to be an excessive rental. This, of course, reduced the amount received by the Wood-

men of the World for the 99-year lease by the amount the rental under the 8-year lease was excessive. As soon as these transactions had been completed and the bonds secured by the 99-year lease had been sold, Fraser began negotiations for the sale of the fee with Byllesby & Company. As a result of these negotiations the fee was sold for $600,000 and transferred to Twerell as trustee. Land trust certificates were issued and sold to finance this transaction. It was at this time that Byllesby & Company secured the option to purchase the fee to the Woodmen Building Corporation controlled by them. It appears, then, that reduced to its final analysis the Woodmen of the World in fact sold the building to the Woodmen Building Corporation for the sum of $1,600,000, less, of course, the amount of excess rental paid by it under the 8-year lease for its quarters, and the question for our determination is whether that is an adequate consideration.

The plaintiff asserts that the consideration was inadequate for the reason that it was less than the cost of the building. We can save many words by including the following tabulation which shows the investment of funds by the Woodmen of the World, and the dates thereof:

| | | |
|---|---|---:|
| 1911 | Cost of land | $ 240,000.00 |
| | Total investment | 240,000.00 |
| 1912 | Cost of building (including machinery and equipment) | 1,114,302.24 |
| | Total investment | 1,354,302.24 |
| 1920 | Cost of additional floor | 93,846.27 |
| | Total investment | 1,448,148.51 |
| 1920 | Improvements and additions to machinery and equipment | 83,714.63 |
| | Total investment | 1,531,863.14 |
| 1920 | Cost of Annex land | 73,876.40 |
| | Total investment | 1,605,739.54 |
| 1921 | Cost of Annex building | 360,778.16 |
| | Total investment | 1,966,517.70 |
| 1925 | Cost of additional equipment | 4,435.52 |
| | Total investment | 1,970,953.22 |

There is testimony in the record that 3 per cent. is a reasonable annual depreciation, and at that rate the depreciated cost value of the building was $1,462,000. While the cost of a building is not contended to be an absolute criterion of its value, it is some evidence to be considered in connection therewith. The same thing is true as to testimony of the cost of reproduction of the building. The reconstruction cost of said building, according to a member of the firm of original architects, was $2,600,000, after deducting reasonable depreciation. According to this same witness, there was little evidence of so-called wear and tear; its upkeep was excellent, and particularly the mechanical features of the building seemed to be in wonderful condition; its life was practically unlimited with proper upkeep. However, we think this witness himself evaluated testimony of this character in reply to a question as to whether the cost of reproduction would not be as much out on the desert; he said it would be more. It might also be true that a building so located would not be salable, and would have no market value.

Fraser also testified as to the value of the building at the time of the sale, "that it was a good sale and the price a good one." At this same time, in order to assist Byllesby & Company to market the bonds on leasehold, he writes and signs a letter, many copies of which were circulated. In that letter he expresses an opinion as to the value of the building in the following paragraphs:

"The land has been appraised by A. L. Reed, of Omaha, at $410,000, and by H. A. Wolf, of Omaha, at $408,000. Holabird & Roche, architects, Chicago, who supervised the construction of the main building, have appraised the buildings as of January 18, 1926, at a sound depreciated or fair market value of $2,600,240. The total fair market value of land and buildings, as thus depreciated, is in excess of $3,000,000, making this issue a 37½ mortgage."

"Total gross income for the two calendar years ended December 31, 1925, averaged $327,983. Operating expenses, including all taxes, except federal taxes and maintenance, and adding thereto the leasehold rental of $44,000 per annum for the same periods, averaged $206,500.74."

We may well digress here to state that neither A. L. Reed nor H. A. Wolf, mentioned in the letter, testified in this case, hence we cannot attribute any force and effect to the appraisal that they are claimed to have made as competent evidence of value. These statements would violate the rule as against hearsay evidence. Mr. Foy, an associate of Holabird & Roche, architects mentioned, did testify. He testified to the reconstruction cost of the building and his testimony makes this plain. He expressly states that he is not making an estimate of the market value of the building. The evidence in the record that Myers and Auerback, two Omaha real estate men, made affidavits as to the value of the property falls into this same classification of incompetent testimony.

Returning to Mr. Fraser, in July, 1925, in a report to the Sovereign Camp, he stated that the building and its annex were carried in our statement of assets at $1,966,-517.70, actual cost, while undoubtedly the property is worth considerably more, not only due to the increase in value of ground, but the increase of material and labor. Of course, we must again point out that this is not competent evidence of value. These statements, as well as the other statements made by him herein, are not under oath, and for the purposes of this case can only be considered as impeaching the witness upon the question of value. The fact is that the record discloses so many widely divergent and contradicting statements by him at various times that, in view of his special interest in this litigation, we deem it necessary to determine this phase from other testimony. Particularly is this true, because from the record it is so apparent that he does not at any time base his judgment of market value upon sound premises. His judgment in this particular seems to be based upon the reproduction cost as well as the income as shown by the account set up by the Woodmen of the World relating to the building. This account indicated an income far in excess of actuality. This was true on account of the fact that an item of rent was carried as income for space occupied by the Woodmen of the World itself in excess of its real value

and because the account did not include all items of expense properly chargeable to the upkeep and maintenance and operation of the building.

The plaintiff relies, not only upon the foregoing statements of value which we have determined are not competent evidence of value, but also upon the fact that the purchasers of the building sold bonds secured by it in excess of the purchase price. The total amount received by the Woodmen of the World for the building was $1,600,000, while the amount of the bonds and land trust certificates secured by the building sold was $1,825,000, some of which were sold at a discount. Does this establish that the building had a market value greater than the selling price? We doubt whether there is any real indication of value of the building from the amount of bonds sold upon its security. The bonds issued upon the leasehold sold for $1,057,500. The purchasers of the bonds never saw the building and bought it upon the representations and reputation of the investment house that sold them.

We come now to a consideration of the most convincing evidence in the record relative to value. In fact, it is the only competent evidence as to value in the record. Even if we were to consider the foregoing statements as competent testimony, it is overcome by competent tsetimony that the property was not worth in 1927 the price received of $1,600,000. The testimony of Charles C. George shows that he possesses a thorough knowledge of real estate values, of business locations, of office buildings, and of the trend of the movement of desirable business locations in Omaha. He values the property at $1,550,000 to $1,600,000. Mr. Harry A. Tukey, who had been in the real estate business in Omaha since 1886, and specialized in business properties, buying, selling, and leasing, including what is known as long time leases, such as 99-year leases, who has had vast experience as an appraiser, fixes the market value of the property at $1,300,000 to $1,500,000. He sold the ground to the Woodmen of the World at the time they erected the building. Mr. L. P. Campbell who had been with the Byron Reed Company, one of the largest real

estate offices in Omaha and in Nebraska, in charge of sales since 1905, and of rentals, property management, and insurance, and who also has had an extensive experience as an appraiser of city property, places the market value on this property as $1,500,000 to $1,600,000. These three witnesses, George, Tukey, and Campbell, show an unquestioned knowledge of real estate values in Omaha. They testified that there is and has been for years a westward movement of the business district, which has made the location of the Woodmen of the World less desirable than when it was built; that since then many of the banks which were east of it have moved two or more blocks west; and other business has moved away from it to such an extent that the building will not return an income which will justify a higher valuation; that income, present and prospective, determines along with other considerations the market value of a building of such a nature. Their testimony is not impeached and it is not contradicted by any other competent testimony. They had no apparent interest in the litigation. Value of property is always a matter of judgment, and a contract based upon inadequate consideration will not be set aside for that reason alone, unless, as the rule is generally stated, the inadequacy is so great as to furnish of itself a convincing evidence of fraud. 9 C. J. 1174. However, from the competent evidence in the record, we conclude that the consideration of $1,600,000 for the sale of the building, even depreciated by the excessive rental of the 8-year lease, was an adequate and fair consideration for the sale of the property. Upon this question, the defendants have sustained the burden of proof to establish by clear and convincing testimony the fairness of the contract even to the degree required of them, even if, as a matter of fact, these transactions were between corporations with common directors.

This case involves almost entirely a question of fact. Its importance, from the magnitude of the value of the property and the great number of people interested, including all the members of the great fraternal beneficiary society, who are as much interested as the plaintiff, as well as the

numerous purchasers of the bonds, justifies the exhaustive consideration we have given it. We have been greatly aided by comprehensive and, elucidating briefs, and oral arguments by able counsel. In view of our conclusions, it is not necessary to consider either the rights of the purchasers of the bonds secured by the 99-year leasehold, or the purchaser of the land trust certificates, since they are not affected by this opinion. The briefs filed by the representatives of these interests have been exceedingly helpful in so far as they discussed the questions covered by this opinion.

In conclusion, we substantially adopt the language of the distinguished trial judge who heard the case, and find that the 99-year lease from the Woodmen of the World to William H. Short, and the lease from the Woodmen Building Corporation to the Woodmen of the World, leasing a portion of the building for 8 years, and the sale and conveyance of the fee by the Woodmen of the World to Albert J. Twerell were each and all made upon adequate consideration and in good faith and without fraud, and were made by the officers of the Woodmen of the World in accordance with the statutes of the state of Nebraska, and the court further finds that the charges of fraud and wrongdoing alleged in the plaintiff's petition are not sustained by the evidence. The judgment of the trial court is accordingly affirmed.

AFFIRMED.

ROSE, J., dissents.