EDGAR H. RETTINGER, FOR HIMSELF AND FOR AND ON BEHALF OF THE STANDARD OIL COMPANY (NEBRASKA), A CORPORATION, AND FOR AND ON BEHALF OF ALL STOCKHOLDERS OF SAID CORPORATION SIMILARLY SITUATED, APPELLEE, V. HENRY W. PIERPONT ET AL., APPELLANTS.

15 N. W. 2d 393

FILED JULY 28, 1944. Nos. 31559, 31560, 31561.

162

*Seymour L. Smith, Ellick, Fitzgerald & Smith, Raymond G. Young* and *Young & Williams,* for appellants.

*Edward J. Peterson, Virgil L. Brown, McKenzie & Dugan, Kennedy, Holland, DeLacy & Svoboda* and *Albert D. Jones, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

WENKE, J.

This action was commenced in the district court for Douglas county by Edgar H. Rettinger, for himself and for and on behalf of the Standard Oil Company (Nebraska), a corporation, and for and on behalf of all stockholders of said corporation similarly situated, as plaintiff. He was subsequently joined by Edward J. Peterson, as an intervener. The action is against Henry W. Pierpont, Morse C. Palmer, Standard Oil Company of Nebraska, a corporation, and Standard Oil Company (Nebraska), a corporation, as defendants. From a decree in favor of the plaintiff and intervener, for and on behalf of the Standard Oil Company (Nebraska), for the use and benefit of the stockholders of said corporation, that they have and recover from the defendants, Henry W. Pierpont, Morse C. Palmer, and Standard Oil Company of Nebraska, a corporation, the sum of $1,465,180.73 with interest at six per cent from August 29, 1939, and the sum of $4,500 for services and costs, each of said defendants, Henry W. Pierpont, Morse C. Palmer and Standard Oil Company of Nebraska, a corporation, has separately appealed. For the purpose of briefs, argument and this opinion these appeals have been consolidated.

The intervener died January 6, 1944, and the action as to him was revived in the name of Maxine Peterson, as ad-

ministratrix of his estate. For the purpose of convenience the plaintiff and intervener will be referred to as plaintiffs; the defendant Standard Oil Company (Nebraska), a corporation, as the old company; the Standard Oil Company of Nebraska, a corporation, as the new company; the individuals by their respective names of Pierpont and Palmer; and the Standard Oil Company (Indiana) as Indiana.

The action is a stockholders' derivative suit in behalf of the Standard Oil Company (Nebraska), a corporation, based on an alleged conspiracy by Pierpont, Palmer and associates together with the officers of Indiana to defraud the old company's stockholders by getting them to sell the assets of the old company to Indiana for less than their value.

We will not set out the extended allegations of the amended petition, on which this action was tried, for when the allegations of a petition are denied this court, on appeal, cannot look to them, except in so far as they are admitted by the answers, for the nature of the conspiracy to defraud but must look solely to the evidence.

Nor will we set out the findings of the lower court, for as stated in 13 Fletcher, Cyclopedia Corporations (Perm. ed.) sec. 5939, p. 295, sec. 5944, p. 299: "In legal effect, a stockholders' suit is one by the corporation conducted by the stockholder as its representative. The stockholder is only a nominal plaintiff, the corporation being the real party in interest. * * * The stockholders' suit is always one in equity, at least unless otherwise provided by statute. A stockholder cannot sue, as a representative of the corporation, by bringing an action at law, notwithstanding the corporation could have recovered in an action at law. Even where the only relief allowable is a recovery of damages the suit is nevertheless one in equity and not an action at law." "This being an equitable action it will be tried *de novo* in this court pursuant to section 20-1925, Comp. St. 1929, and we will reach an independent conclusion without referring to the findings of the district court." *Beard v. Morgan*, 143 Neb. 503, 10 N. W. 2d 253. Subject, however,

to the condition that "when the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." *Dier v. Dier,* 141 Neb. 685, 4 N. W. 2d 731.

There are many errors that have been assigned but have not been argued in the briefs or orally and will, therefore, be considered as waived. While many other errors are assigned and discussed in the briefs, we will only discuss those necessary for a determination of the matters involved.

The facts show that the old company was organized in 1906 as a Nebraska corporation but a subsidiary of Indiana. It remained such until 1911 when, by reason of the same being found to be part of a combination in restraint of trade, it was by order of court required to be separated. As a result, in 1911, the old company emerged as an independent and separate Nebraska corporation and one in which Indiana held no stock. However, the old company continued, over the period of its existence, to purchase practically all of its merchandise from Indiana.

It was purely a marketing company engaged in the sale of gasoline, oils, and associated petroleum products. Originally this was done entirely through bulk stations, which included tank wagon delivery service, located along the tracks and on the premises of the various railroads throughout the state. Fourteen of these stations were in operation in 1906 and 312, or 95 per cent, of all bulk stations were constructed during the period of 1906 to 1909, inclusive. Subsequently marketing developed through service stations. The first such station was erected in 1913 at Twelfth and O streets in Lincoln, Nebraska, and from 1913 to 1919, 24 such stations were built. Beginning with 1920 and to and including 1928 it greatly expanded this service throughout the state by building 87 per cent of its service stations.

In connection with this business it had the exclusive use

of the word "Standard" in the state of Nebraska and also of the trade name "Red Crown" for gasoline, "Perfection" for kerosene, "Polarine" for oil and "Mica" for axle grease. From its beginning up to and including the year 1931 the operation of the business was exceptionally profitable and the dividends, both cash and stock, based upon such earnings were exceptionally good.

At the time of the sale of the assets of the old company on August 29, 1939, the officers and directors were Henry W. Pierpont, president; Carl N. Humphrey, vice-president; Morse C. Palmer, secretary-treasurer; Alfred G. Ellick and Earl K. Buck.

There are two matters upon which evidence was offered which, in point of time, are too remote to be relevant to the action herein. However, the appellee contends they show a disposition on the part of the then officers of the corporation, some of whom were still with the old company when the assets were sold on August 29, to use the corporation for private gain. We will discuss them here.

The first of these is a stock transaction had on March 26, 1926, when the then officers and directors of the corporation, consisting of A. H. Richardson, president; G. M. Smith, vice-president; Henry W. Pierpont, secretary-treasurer; W. H. Herdman and Carl N. Humphrey, purchased 1,794 shares of the stock of the old company at $230 per share, which stock had a par value of $100. They paid for this stock by giving their joint note to the Omaha National Bank, United States National Bank of Omaha and the United States Trust Company of Omaha in the amount of $412,-620. No money of the old company was in any way used for this purchase. As there were few stockholders of the old company in Nebraska at the time, the purchase was made for the purpose of distributing this stock by selling it to local people with the hope that they might become customers and boosters of the old company. For this purpose the par value of the stock was reduced, after the purchase, to $25 and most of this stock was then distributed by sell-

ing it to people throughout the state. While the evidence does not clearly disclose what the result of this transaction was, it seems that it was not financially profitable to the individuals, although, it does appear that the distribution of the stock throughout the state was desirable and beneficial. We can see nothing wrong in this transaction.

The second is the matter of its annuity plan. It appears that the company had, from its beginning, a retirement plan for its employees and officers in the form of an annuity. This plan was amended in 1918 and again in 1922. Eligibility thereto and the amount thereof was based on length of service and compensation received at the time the officers or employees retired. This was a voluntary plan pursuant to which the employees made no payments for the benefits. The company, in order to take care of the annuity retirement payments that had or would accrue thereunder, had deposited considerable funds in the form of a trust. However, on January 11, 1932, pursuant to notice given the the stockholders, this plan was amended whereby the employees would pay from that date a certain percentage of their salary or wages for such benefits and same became fixed and certain when the right thereto had accrued. To carry out the provisions thereof in behalf of those officers and employees who were eligible thereto a contract was entered into with the Equitable Life Assurance Society of the United States underwriting this plan. There was paid at that time approximately $339,000 to underwrite the amount of the annuities already earned by the various officers and employees based on their period of service and the amount of their salaries. Most of this payment was money previously set aside. Sufficient was added to cover the full amount of the premium. The principal complaint to this transaction is that the action of the officers of the company, particularly President Richardson who thereby secured a the premium paid, was an excessive and unreasonable taking of the assets of the old company and that the notice right to an earned annuity which required $119,641.89 of

sent to the stockholders for the purpose of the meeting of January 11 was not in sufficient detail to authorize such a use of the corporation's funds. However, while it might have been desirable to have placed a maximum on the amount which officers could receive, the annuity plan of the old company had no such limitation prior to January 11 nor was this in any manner changed at that time. The only material changes being from that date the employees were required to pay a part of the cost of their annuity and the same became fixed and certain, based on the length of service at the time of retirement and compensation received. It is significant to note that the salaries of all officers were thereafter immediately reduced, including the salary of the president which was reduced from $25,000 to $16,500 per annum. While it does seem that the amount of retirement pay which Richardson would receive under the annuity plan is very large, the amendment of January 11 in no way increased the amount which he would have received under the old plan. The only change was that it became certain by reason of the action taken in purchasing the policy. We do not think this transaction, under these circumstances, was in any manner an act of bad faith on the part of these officers and directors.

Shortly after the commencement of the trial herein the plaintiffs withdrew from their cause of action the matter of mismanagement of the corporation in such a manner as to practically deplete the assets as follows: Mr. Ellick: "* * * As I understand it, you are withdrawing your claim?" Mr. McKenzie: "That the officers ran the corporation in such a manner as to practically deplete the assets." Mr. Ellick: " * * * You will abandon that?" Mr. McKenzie: "Yes." However, much evidence was offered on many acts and omissions of the officers and directors that are purely matters of corporate business policy and management which are committed to the discretion of the officers and directors and with respect to which their decision is final in the absence of usurpation, fraud, or gross negligence.

The period covered by the following discussion of the old company's management is generally from 1932 down to the date of the sale of the assets on August 29, 1939.

The agency contracts entered into by the old company with its various employees, particularly commission agents, were upon such terms that it was difficult, if not impossible, for the agents to make a reasonable income. This resulted in a constantly high percentage of change in personnel throughout the state and seems to have left a good deal of bad publicity, especially in the smaller communities. Many of these agents were subsequently employed by other gasoline companies and took many of the company's customers with them. On the whole, both as to bulk and service stations, this created a rather unhealthy situation.

It was further developed that the old company either failed to meet or was so slow in meeting price cutting or price conditions in the field that it affected its sales. When, in 1934, it adopted a policy of meeting such price conditions its operating loss was very large and resulted in a net operating loss for that year of $641,624.43. While the evidence discloses that many customers and eventually considerable business was lost by failure to meet the uncertain price conditions that existed during this period, however, whether or not meeting all competition would have been a desirable thing on the part of the officers and directors is a serious question.

At the time of their construction the old company's standard type service station usually included a canopy, one inside toilet, a single drive-in, a visible gravity pump, and a pit for lubrication. During the period of 1929 to 1939 the increase of service stations of all other companies over the state was approximately 149 per cent and certain features of the standard type station became more or less obsolete because of changing conditions. With the increase of truck transportation considerable gasoline patronage was lost because the canopy either interfered with or made it impossible for trucks to be serviced at these stations. The in-

creased speed of automobiles and the desirability of a quick drive-in caused the one side drive-in for both ingress and egress to become an undesirable feature. Likewise, with the increase of tourist traffic, the single inside toilet did not meet the demands of the public and was not an inducement to their patronage. Through the development of the electric computer pumps, which permitted quicker service, the visible gravity pump became less desirable. Also, the pit was replaced by the more desirable modern lift lubritorium and lighting by bulbs was replaced with neon or indirect systems. All of these factors had their effect upon the appeal of these stations to the public as service stations and had their influence in the decrease of its business. Because of the expense involved the officers and directors did not enter into a program of modernization except for a few stations.

The bulk stations of the company were constructed adjacent to the tracks of the various railroads throughout the state and generally on premises which the company leased from them. They had inside loading with gravity or hand pumps and in the beginning served their customers with small 300-350 gallon mule drawn tanks. More modern facilities would have recommended outside loading to give more inside room, power driven pumps for quicker unloading of tank cars and the loading of service tanks. But due to the gradual decrease of bulk stations the company did not engage in modernizing its bulk stations except in the instance of a few larger places. It did provide larger tank service with motor transportation. Whether this materially affected the business is not certain.

In this connection the evidence shows the old company, for a considerable period of time, failed to meet a situation in the field by supplying what is known as "hot" tractor fuel which apparently affected its sales of that product.

One of the major factors which affected the profitable operation of the entire system was the development of motor transport for hauling gasoline. Until the entry of truck

transports into the field of transportation all gasoline was shipped by rail. All the bulk stations were located on railroad trackage with facilities for rail transportation and with but few exceptions were located on leased premises. At the time of the entry of this new type of transportation the officers and directors seriously considered the matter of the old company entering the field by purchasing a fleet of transports. Upon carefully considering the extensive investment necessary to purchase the transports, the expense of rebuilding both its bulk and service stations for transport facilities, the possibility that the railroads might cancel its leases and make necessary its moving its bulk stations, with the hope and expectation that the railroads would meet this new competition by rate adjustment and in view of the then existing business depression, the officers and directors decided not to enter the field and to continue to ship by rail. In view of what subsequently transpired, when the railroads failed to adjust their rates and the old company had to meet this ever increasing type of competition, the policy adopted is questionable. The gross margin on gasoline was materially reduced and was unquestionably the major factor in the inability of the management to continue to operate the company at a profit. But whether or not this was a wise business policy for the company to pursue is not for this court to decide.

There is evidence to indicate that part of the company's financial difficulties may have been due to the management's operating the company with an excessive personnel. This is disclosed by a survey made in the forepart of 1939 pursuant to which a reduction in personnel permitted a decrease in operative overhead of approximately $115,000 per annum.

It further appears that during the years 1936 to 1938, inclusive, the board of directors adopted a policy of retiring stock by purchasing it on the market and for this purpose expended some $331,000. This transaction on its face would appear to have been beneficial to the company for it

appears that it was purchased for much less than its book value and much less than was received for the balance of the stock when the assets were sold to Indiana.

During the period when the old company was constructing most of its service stations the state had not definitely fixed and determined its system of permanent highways and subsequently, when such highways were permanently located, 48 of the stations which had formerly been built on highways were removed therefrom. Due to these changes 25 of these 48 stations were closed because of the loss of business. The amount of gasoline the others were able to sell was materially reduced. The company generally made no effort to change its stations to other locations on the highways although in some instances it purchased a new location and opened a new station.

The evidence further shows that the company spent about $100,000 a year advertising its products under the trade names and marks of which the company had exclusive use.

The old company, during the years of 1935 to 1938, inclusive, was able to obtain $248,160.76 in the form of rebates from Indiana based on a showing of loss due to price conditions in Nebraska.

As stated in *Johnson v. Radio Station WOW*, 144 Neb. 406, 13 N. W. 2d 556, as quoted from 19 C. J. S., sec. 743, p. 83: "Within the limits of their authority directors or trustees possess full discretionary power, and in the honest and reasonable exercise of such power they are not subject to control by the stockholders or by the courts at the instance of a stockholder, * * * in the absence of usurpation, of fraud, or of gross negligence, courts of equity will not interfere at the suit of a dissatisfied minority of stockholders, merely to overrule and control the discretion of the directors on questions of corporate management, policy, or business." And in *Royal Highlanders v. Wiseman*, 140 Neb. 28, 299 N. W. 459: "The accepted principle is that the wisdom and expediency of corporate business policies and the methods of executing them are left to the discretion and de-

cision of the board of directors. In the absence of usurpation, or fraud, or gross negligence, or transgression of statutory limitations, courts of equity will not interfere at the suit of dissatisfied stockholders merely to overrule the discretion of directors on questions of corporate management, policy or business."

As stated in *Hawes v. Oakland,* 104 U. S. 450, 26 L. Ed. 827:

"We understand that doctrine to be that to enable a stockholder in a corporation to sustain in a court of equity in his own name, a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist as the foundation of the suit—

"Some action or threatened action of the managing board of directors or trustees of the corporation which is beyond the authority conferred on them by their charter or other source of organization;

"Or such a fraudulent transaction completed or contemplated by the acting managers, in connection with some other party, or among themselves, or with other shareholders as will result in serious injury to the corporation, or to the interests of the other shareholders;

"Or where the board of directors, or a majority of them, are acting for their own interest, in a manner destructive of the corporation itself, or of the rights of the other shareholders;

"Or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation, which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity."

As stated in *Benedict v. Columbus Construction Co.,* 49 N. J. Eq. 23, 23 Atl. 485: "If stockholders in a corporation disapprove of the company's management, which is conducted without fraud, or by action *ultra vires,* or in gross abuse of trust, or shall consider their speculation a bad one,

their remedy is to elect new officers or sell their shares and withdraw."

Looking backward it would appear that some of these business policies of management, as adopted and carried out by the officers and directors of the old company, especially between 1932 and the date of the sale in 1939, did not work out for the best interests of the company. But it is altogether too easy to be critical of the actions of others based on hindsight rather than foresight. Especially is this true in view of the economic uncertainties of this period due to what is generally referred to as a business depression. But examining the actions taken by the officers and directors, we find nothing that tends toward usurpation, fraud or gross negligence and in their absence nothing for which they should in any way be held legally liable for damages.

For many years the old company had been operating on a very successful basis. But commencing with 1932 and continuing through 1938, except for 1936, it was not able to operate at a profit and during those years sustained net losses as follows:

| | |
|---|---|
| 1932. | $152,355.14 |
| 1933 | 285,233.12 |
| 1934 | 594,849.86 |
| 1935 | 41,607.67 |
| 1936 | 34,390.07* |
| 1937 | 96,125.42 |
| 1938 | 111,731.25 |

* Profit

This condition was due to many causes already discussed, such as: Price cutting, competition from truck transports (the old company transporting its products by rail) which caused a sharp decline in the margin of gross profit per gallon sold, competition from a large increase of service stations particularly in view of their containing more modern facilities, changes of state highways leaving stations isolated and off well-traveled roads, management's policy of han-

dling its agents, and operative overhead. This continued loss, over a period of years, caused considerable restlessness on the part of stockholders, particularly the local ones, and created a desire to dispose of the company's assets or to merge it with some integrated company that had producing and refining together with marketing.

In July of 1938, in realization of this fact and after having been contacted by a stockholder in New York, Pierpont, on his return through Chicago, contacted Seubert, president, and Barkdull, executive vice-president, of Indiana, and suggested this situation to them and that they do something—looking toward the purchase or merger of the old company with Indiana. As a result of this contact Indiana, in the forepart of August, sent out Boatwright, head of the research department, Naylor of the sales department and Hanna and Perrenot of the accounting department, who, for a period of some two weeks, checked the affairs and business of the old company. After their return to Chicago, Pierpont, on September 21, 1938, again contacted the officers of Indiana and they advised him they were not interested in acquiring the assets and business of the old company either through purchase or merger. But, from the survey made, they thought that certain economies could be made in the operation of the old company and were willing to permit their research department to be used for that purpose. Pierpont brought this information to the attention of his board of directors and pursuant to their authorization made arrangements with Indiana to have their efficiency experts come out for the purpose of making an efficiency survey of the old company.

On January 23, 1939, Hughes of the accounting department and Jones of the sales department of Indiana came to Omaha and started their survey. They completed this survey about June 30, 1939. Their method of procedure was to take some department, study and survey its operations, then make a written memorandum of proposed changes and send a copy to Boatwright, head of the research department

of Indiana, and deliver a copy to Pierpont. A conference was then had between the officers of the department, the officers and directors of the old company and either Jones or Hughes, whoever had made the survey of that particular department, and the proposed recommendations were either rejected, approved or modified and, as approved or modified by the directors, put into effect. The estimated total of all economies put into effect was in the amount of $115,078 and had all been acted upon when the survey was completed.

Jerome A. Newman, of the firm of Graham-Newman Corporation, owners of 1,500 shares of stock of the old company, through appointment called on Pierpont March 6, 1939, to discuss matters relating to this investment. When he called Pierpont gave Newman all the information he wanted about the company, including an opportunity to see some of its different properties. Newman, who was experienced in buying controlling interest in the stock of corporations, indicated to Pierpont that he might be interested in making an offer of $11.50 per share for the stock. At Pierpont's suggestion he decided to wait until after the annual stockholders' meeting of April 10, 1939, when two additional directors were to be elected.

Newman was advised that the policy of the company did not permit him to have a list of the stockholders and their addresses but he made arrangements with the officers and directors to supply them with the offer in printed form, the company to address the envelopes, and he to actually mail them. On April 20, 1939, he brought to Omaha his printed offer dated April 17, 1939. The company addressed and he actually mailed the offer, paying the expense thereof. This offer was for $12 per share conditioned on the acceptance of 107,000 shares or approximately 66 per cent, same to be deposited according to the offer by May 4, 1939, with an option on his part to extend the date to May 18, 1939. This option he exercised but at the end of the extended period the owners of somewhere between 33 and 46 per cent of the stock had accepted the offer. Newman then withdrew the

offer and the deposited stock was returned to the owners.

The directors, considering the offer as a matter directly between the stockholders, did not send any recommendations in regard thereto to the stockholders nor did the special stockholders' committee, appointed at the stockholders' meeting of April 10, 1939, do so. The committee, considering the offer too small, at first contemplated doing so and had Ellick prepare such a letter. They were not satisfied with the letter he prepared and upon further consideration by the full committee decided to abandon the idea.

During the time the offer was in effect Pierpont received inquiries in regard to the company from stockholders and parties representing stockholders. To these inquiries he made extended replies which included the following statements:

"We have consistently carried on our regular depreciation charges as set up by the government several years ago. No revaluation of properties or adjustment of depreciations have been made since that time, so we believe even with depressed conditions that the book value as shown in our statement is a reasonably close value of the present assets of the company."

"You will note the current assets—which could probably be converted into cash in a comparatively short time—amount to a little over Mr. Newman's offer of $12 per share. Over and above that figure are the fixed assets of $17.31 per share, making the total book value on our stock $29.33 per share."

On March 17, 1939, the statement of the old company as of December 31, 1938, was mailed to all stockholders. Also, an operating statement for the year 1938 showing a net loss of $111,731.25. With these statements Pierpont sent a letter showing that most of this loss was overcome by the company's purchase of 5,000 shares of its stock on the open market for $34,730.50 which resulted in $90,269.50 addition to capital surplus leaving, as he states, "The book value per share at the end of 1938 amounted to $29.33 as com-

pared with $29.36 a year ago. Net current assets per share at the close of 1938 amounted to $12.02 as compared with $11.94 at the end of 1937."

After Newman's call on March 6, 1939, and after the 1938 annual statement had been sent out, Pierpont again called on the officers of Indiana on March 24, 1939, but they again advised him they were not interested in acquiring the old company's assets and business.

At the annual meeting of the stockholders held on April 10, 1939, Ellick and Buck were elected to the board of directors in place of Herdman, deceased, and Richardson, retired, making the new membership of the board Pierpont, Humphrey, Palmer, Ellick and Buck. At this meeting considerable discussion was had relative to merging with an integrated company, that is, one having production and refining as well as marketing. A stockholders' committee, consisting of Terry Reimers, who acted as chairman, Frank J. Fitzgerald and Lawrence Brinker, was appointed to advise with the management.

On April 13, 1939, and after the stockholders' meeting, Pierpont and Ellick went to Chicago where Ellick met the officers of Indiana and they generally discussed the affairs of the old company but Indiana continued to show no interest in acquiring the old company.

During all of Pierpont's negotiations with Indiana he kept the directors fully advised thereof but none of the stockholders, including the stockholders' committee, was given any information in regard thereto until the release to the press on July 26, 1939. All negotiations were handled by personal contact until the submission of the formal offer on July 21, 1939.

Under date of May 5, 1939, Terry Carpenter of Scottsbluff, Nebraska, an operator in the refining, wholesale and retail distribution of petroleum products, sent a letter, the terms of which he immediately released to the press, containing an offer of $13 per share for 51 per cent of the stock, subject to conditions as therein provided, or an ex-

change of stock with Terry Carpenter, Inc., upon some method to be determined by the parties. On May 8, 1939, reply was made that the management would make their facilities available so the offer could be made to the stockholders the same as the Newman offer and that the board of directors would be glad to confer with him in regard to the suggested merger. Carpenter never replied to this letter either by mail or in person and never attempted to complete either the proposed offer to purchase or any plan for merger.

After Newman's offer was sent out and after Carpenter's letter was received and its contents released to the press, Pierpont, on May 16 again called on the officers of Indiana but they were still not interested but suggested that if he had any further reasons, not already discussed, why he thought they should acquire the business and assets of the old company they would be glad to consider them.

Pierpont then prepared a written memorandum of reasons why Indiana should be interested in acquiring the business and assets of the old company. Reciting the business conditions of the company, the uneasiness of the stockholders due to continued losses, the offers already made for the stock, and other matters, most of which have been recited in this opinion, he pointed out that whoever acquired the old company would have the exclusive use of the name "Standard Oil Company" and the trade-mark brands owned by the company in Nebraska. This extended memorandum was delivered to the officers of Indiana.

After this memorandum was presented the officers of Indiana became interested and at a meeting in the forepart of June, Stephens, general counsel for Indiana, presented a plan for an exchange of stock. When the plan was presented to Ellick, general counsel for the old company, he advised the plan was not feasible for the reason that it was not legal under Nebraska law.

However, on June 20, 1939, Ellick and Pierpont went to Chicago and had a conference with Seubert, Barkdull and

Stephens and suggested to them that they purchase the assets of the old company. Ellick, in analyzing Stephens' proposal of exchange, suggested that it would reasonably yield the stockholders $17.50 per share. Seubert, however, refused to consider a cash offer of more than $15. Upon their return the directors of the old company discussed and considered Indiana's suggested offer of $15 per share but decided it was too low and that they could not recommend it to the stockholders.

In the meantime the adjourned annual stockholders' meeting of April 10, 1939, reconvened on June 12, 1939, with 46 stockholders present. At this meeting Reimers, chairman of the stockholders' committee appointed on April 10, gave an oral report of their activities. It may be said here that the committee had full co-operation from the officers and employees of the old company in obtaining information and had free access to the books and records. They were, in keeping with the company's policy, denied the names and addresses of the stockholders although they were advised that any information they wished to send to the stockholders would be addressed and mailed. Among the many things discussed in his report Reimers stated the company's loss in assets (as shown by its annual statements) over the period from 1930 to 1938, inclusive, and stated the loss for the first quarter of 1939 to be $76,581.79. Pierpont, in his remarks at this meeting, stated that as a result of changes due to the efficiency survey by the men from Indiana the company, over a period of a year's time, would make a savings in operative costs of around $115,078 all of which would be in effect by June 15, 1939. This information was at the time given publicity in the World Herald of June 12, 1939.

Upon a motion being made to adjourn the annual meeting for 60 days Pierpont suggested that it would not be for the best interests of the company to again adjourn the meeting. After considerable discussion by the stockholders present he stated: "As far as I am concerned—and I know the other

Directors back me up—if this company is given a reasonable time (and I mean by 'reasonable' say up to the next annual meeting) to work out our different problems, whatever they may be: and if they cannot work these out—then to submit a proposition to the stockholders which will get them their money out of the company." The meeting adjourned *sine die.*

On July 6, 1939, Pierpont and Ellick returned to Chicago and advised the officers of Indiana that they were not willing to recommend $15 per share but Ellick suggested that they increase their offer to $17.50. The officers and directors of Indiana, who were present, had an informal meeting and then advised that they would recommend to the full board an offer of $17.50 per share. With this tentative offer as a basis, Ellick was to prepare a proxy for submission to the S.E.C. for approval. Pierpont, at this time, insisted that the offer contain a provision for a deposit of $800,000 to show the good faith of the bid and to keep out, as he stated, "fly-by-night bidders." Indiana, although objecting to the necessity of this requirement because of their financial standing, agreed to include it as a part of their offer and subsequently did so. It was agreed that the offer was to be kept confidential between the officers and directors of both companies in order that no one, either stockholder or outsider, might gain by trading in the stock on the market because of such inside information.

Ellick then prepared the proxy. On July 12 he and Pierpont stopped in Chicago on their way to Washington to see Stephens, general counsel of Indiana, who had prepared the tentative offer. Stephens inspected and approved the proxy. Ellick and Pierpont then proceeded to Washington where on July 14 they consulted Anderson, counsel for the S.E.C., as to the form of the proxy. Anderson suggested a later date than December 31, 1938, for a statement of the company and that the proxy include a statement of what the stock had been selling for on the exchange. As a result of these suggestions a statement of the company as of May 31,

1939, and a statement of the high and low prices of the stock on the New York curb exchange from July 1, 1937, to June 30, 1939, were added to the proxy.

With these additions the proxy was again submitted to the S.E.C., but no changes or additions were suggested.

On July 19, 1939, Buell Jones, of the legal staff of Indiana, came to Omaha and discussed with Ellick and Pierpont the final draft of the offer. At the same time Boyle and Hanna came out to verify the cash, check the investments of the company in the form of securities and to check and verify their last monthly statement.

On July 21, 1939, Indiana submitted its formal written offer to the old company by depositing it in the mail at Chicago. This offer the old company received on July 22, 1939. On July 24 the board acted favorably on Indiana's offer and decided to recommend it to the stockholders and informed Indiana of this fact. Although a special stockholders' meeting could be called in ten days the directors called the meeting to consider the offer for August 29, 1939.

Although the officers and directors of both companies had agreed not to release any information as to the offer until it was submitted to the stockholders, however, Pierpont, because of increased activity of the stock on the curb exchange, called Seubert and explained this situation. It was then decided that there might be a leak and that in fairness to the stockholders it should be released at once. This was done and wide publicity was given the offer and its terms in the Omaha World Herald and many other papers including Chicago and New York. It also received publicity in publications devoted exclusively to the petroleum industry.

Following the release of this news the employees of the old company became considerably disturbed as to their future if Indiana should acquire the assets of the old company. Pierpont called Seubert and with his approval informed the employees there need be no fear of losing their jobs for if Indiana acquired the assets it intended to con-

tinue to operate the business and would retain all employees whose work was satisfactory.

Subsequent to the board of directors' call of a special meeting of the stockholders on August 29, 1939, to consider Indiana's offer of $17.50 per share, net, for the 161,403 shares of the old company, the board of directors had prepared and sent to each of the stockholders under date of July 28, 1939, a proxy statement.

This proxy statement sets forth Indiana's offer that it would purchase "all of the assets of said Standard Oil Company (Nebraska) of every class, character and description, including, but without limitation, the good will and all trademarks, trade names, copyrights, patents, patent rights, or other incorporeal hereditaments heretofore acquired by the said Standard Oil Company (Nebraska), and including also the right to use the name of 'Standard Oil Company' in Nebraska, it being understood that the purchaser shall succeed to and acquire all of the properties, rights and privileges now owned by the Standard Oil Company (Nebraska), including those acquired by usage" and pay therefor "a sum sufficient in amount to yield to the stockholders of Standard Oil Company (Nebraska), in complete liquidation of said company, the sum of Seventeen Dollars and Fifty Cents ($17.50) per share at Omaha, Nebraska."

It further states that no director or officer of the company has any interest in the matter of the purchase, either directly or indirectly, and sets forth the shares of stock owned by each director as follows:

| | |
|---|---|
| Henry W. Pierpont | 308 shares |
| Carl N. Humphrey | 988 shares |
| Morse C. Palmer | 316 shares |
| Alfred G. Ellick | 100 shares |
| Earl K. Buck | 830 shares |

It contains a statement of income and surplus for the period of three years and five months, ending May 31, 1939, showing the net loss for the first five months of 1939 to be $100,137.32. It also contains a balance sheet of the company as of December 31, 1938, and May 31, 1939.

The May 31, 1939, statement is as follows:

ASSETS

| | | | |
|---|---|---|---|
| **Current Assets:** | | | |
| Cash | | $384,480.85 | |
| Investments | $821,901.89 | | |
| Less reserve to reduce to quoted market values | 132,631.89 | 689,270.00 | |
| Customers accounts receivable | 458,375.58 | | |
| Less allowance for doubtful | 1,000.00 | 457,375.58 | |
| Inventory | | 750,658.38 | |
| Other current assets | | 36,752.57 | $2,318,537.38 |
| **Properties:** | | | |
| Real estate | | 1,424,374.67 | |
| Buildings & equipment | 3,512,801.03 | | |
| Less reserve for depreciation | 2,220,830.13 | 1,291,970.90 | 2,716,345.57 |
| Prepaid and deferred charges, miscellaneous items | | | 9,755.88 |
| | | | $5,044,638.83 |

LIABILITIES

| | | | |
|---|---|---|---|
| **Current Liabilities:** | | | |
| Accounts payable—Trade | | 292,622.03 | |
| Accrued liabilities | | 122,583.60 | 415,205.63 |
| **Capital:** | | | |
| Common stock (Par $25.00— Authorized 200,000 shares) Outstanding 161,403 shares | | 4,035,075.00 | |
| **Surplus:** | | | |
| Capital | 678,171.81 | | |
| Earned—deficit* | 83,813.61* | 594,358.20 | 4,629,433.20 |
| | | | $5,044,638.83 |

It further states: "The loss of $100,137.32 for the first five months of 1939, as shown in the statement of Income and Surplus, is not necessarily representative of the remaining seven months of the current year, because the major portion of a calendar year's business is done during the warmer months of the year."

"The highest and lowest market prices of the stock of the Company on the New York Curb Exchange during each quarter for the period July 1, 1937 to June 30, 1939 were as follows:

| YEAR | QUARTER | HIGH | LOW |
|------|---------|------|-----|
| 1937 | Third | 11 1/4 | 8 1/8 |
| | Fourth | 9 1/4 | 8 |
| 1938 | First | 7 1/2 | 6 1/8 |
| | Second | 7 | 6 1/4 |
| | Third | 8 3/4 | 6 1/4 |
| | Fourth | 8 | 5 1/2 |
| 1939 | First | 6 7/8 | 6 |
| | Second | 11 . | 6 1/8 |

"The Company owns no producing or refining properties or pipe lines, and its operations have been confined exclusively to distribution in Nebraska, at wholesale and retail, of petroleum products and some automobile accessories. The management attributes the operating losses that the Company has suffered in six of the past eight years largely to wholesale and retail marketing conditions in the State of Nebraska. Nothing is indicated to the management that these conditions are likely to materially improve in the reasonably near future. In view of the effect of these conditions on the ability of the Company to operate at a profit, the Directors after a careful study of the situation, feel that the best interests of the stockholders will be served by a sale of all of the assets at this time, to avoid further depletion thereof by operating losses. If no better offer is made than the one quoted above, the Directors recommend its acceptance."

Accompanying this proxy statement was a notice to the stockholders of the special meeting on August 29, 1939, at 10 a. m. (CST) to consider Indiana's offer, which provided as follows: " * * * and to consider and act upon any other CASH OFFER, in excess thereof, accompanied by a like performance guarantee deposit, for said assets, that may be submitted in writing to the Board of Directors or to the stockholders at any time before any of such offers shall

have been accepted by the stockholders at said special meeting or at any adjournment or adjournments thereof."

Two forms of proxy accompanied this notice. The proxy against the sale provides in part: " * * * AGAINST A SALE of the assets of the Company for any sum whatsoever." While the proxy for the sale provides in part: " * * * FOR A SALE of all the assets of the Company for a cash sum that will yield to the stockholders in complete liquidation of the Company the sum of at least Seventeen and 50/100 ($17.50) Dollars per share at Omaha, Nebraska. In the event one or more better cash offers for said assets shall be submitted in writing by a responsible party, before the stockholders shall have accepted any offer herein authorized to be accepted, then the undersigned hereby authorizes the said proxies to vote FOR an acceptance of such better cash offer as said proxies shall, in their sole discretion, determine to be such."

Both forms of proxy appoint Pierpont, Buck and Ellick proxies to represent and vote the stockholder's shares at the special stockholders' meeting as in the proxy provided.

Between the time these proxies were mailed and the date of the special meeting employees of the company contacted stockholders and asked them to vote. On August 14, 1939, the company sent out a follow-up letter to the stockholders who had not voted and urged them to do so because of the importance of the matter submitted. But in no instance were the stockholders told or advised as to how to vote. When a stockholder voted both proxies, as the evidence shows some of them did, both were promptly returned with the suggestion that they vote only one.

At the special stockholders' meeting the notice of the meeting was read and then the offer of Indiana. At the conclusion thereof the chairman stated that no other cash offer or other offer for the assets of the company had been submitted in writing or otherwise to the board of directors or the officers of the company and asked if there was any person present desiring to submit any such offer. There being no response, the offer of Indiana was then submitted for

consideration. The offer was accepted by a vote of 130,750 shares for and 3,451 shares against and the officers and directors authorized and directed to do all things necessary to carry out the acceptance and to dissolve the old company within a period of not more than six months.

After Indiana made their formal offer for the assets of the old company, Stephens, general counsel, made arrangements for and Buell Jones had prepared the articles of incorporation of the new company for immediate filing if their offer was accepted. This was done to avoid any lapse and thus prevent any possible loss of the use of the name of the old company "Standard Oil." On August 29, 1939, Buell Jones, counsel for Indiana, was in Omaha to consummate all matters in connection with their offer and upon being advised that it had been accepted immediately communicated with the proper parties in Lincoln and had the articles of incorporation of the new company filed. Indiana owned all the stock of the new company.

The assets of the old company were shortly thereafter transferred to the new company and the stockholders of the old were, as soon as possible, paid the sum of $17.50 per share. Edward J. Peterson, who voted his 51 shares against the sale of the assets, surrendered his certificate of 32 shares for cancellation on September 12, 1939, and received $17.50 per share and on September 19, 1939, surrendered his certificate for 19 shares and received $17.50 per share. Edgar H. Rettinger and wife, Velma M., who held 100 shares as joint tenants with right of survivorship, sent in their stock for cancellation and retirement on September 12, 1939, and received their check for $1,750 in liquidation thereof dated September 13, 1939. The check of the company being signed for it by Rettinger himself.

In connection with the purchase taxes had accrued and remained unpaid in the sum of $44,406.44 but were not listed as a liability by the old company on their statement. Indiana was required to pay these taxes and it increased their bid by that amount.

During the time these negotiations were being carried on

with Indiana others, besides Newman and Carpenter, contacted Pierpont seeking to work out a plan of exchange of stock, merger, or a purchase of the assets of the old company.

On July 23, 1937, George D. Locke, former vice-president of Barnsdall Oil Company and at the time engaged in special work, wrote Pierpont relative to the possibility of getting the old company and the Champlin Refining Company together which "would make Nebraska an integrated company overnight." This letter was answered August 4 with the reply that he would be very glad to go over the matter with him when he returned from Europe and suggested that he bring certain material with him so they would be able to discuss the matter intelligently. In the early part of September Locke came to Omaha and advised that he had been over the matter with Mr. Champlin and he was not interested. As a result these negotiations never developed into any definite proposition or offer.

In the early part of 1938, when Pierpont was in New York, L. V. Nicholas contacted him relative to a possible merger with some other company but did not disclose the principal. This resulted in another meeting in New York in August and Nicholas coming to Omaha about the middle of the month. On August 23, 1938, they had a conference in Kansas City with Vickers and Henderson, president and vice-president of the Vickers Petroleum Company, who were interested in a list of the stockholders as they wanted to go out and buy up the stock of the company the best they could. Pierpont refused them this information but stated he would be glad to accept any proposition they might make and would submit it to the stockholders. Vickers then decided they were not interested and no further negotiations were had.

At the time Pierpont was in New York about the middle of 1938 he was contacted by J. B. Huffard, a stockholder of the old company, relative to helping work out a deal whereby the company might become integrated. However, on August 9, 1938, Huffard wrote advising that the party he

was dealing with was not interested so this transaction fell through.

On April 24, 1939, following the publication of the Newman offer, Pierpont received a telegram from Thurman Hill advising that the Bay Petroleum Company thought they could offer a more advantageous plan and would like to confer with the management. This was followed by a letter from C. U. Bay, president of Bay Petroleum Company, dated April 25, confirming Hill as his representative, pursuant to which a meeting took place with Hill. Thereafter Bay and Roland V. Rodman, vice-president and general manager of the Bay Petroleum Company, came to Omaha and had a meeting with Pierpont and Ellick on Sunday, June 1, 1939, at which time they discussed the possibility of a merger between the old company and the Bay Petroleum Company. After a telephone call from Rodman on June 26 asking for additional information, which Pierpont sent him on the following day, nothing further transpired until after the Indiana offer. On August 3, 1939, Bay wrote Pierpont to the effect that he thought they could make a more advantageous offer than the one they had through the purchase of the assets of the old company by an exchange of stock. In his reply on August 5 Pierpont pointed out Ellick's viewpoint that a stock exchange would not be practical as it would take the unanimous consent of the stockholders, which would be very hard to get, and suggested that the only feasible way to handle the situation was a cash offer for the assets. He advised that the Indiana offer was open and the proxies provided that a better offer could be accepted. With this letter he mailed all of the enclosures sent to the stockholders with reference to Indiana's offer. No further negotiations were had after this letter as Indiana's offer was in excess of what they thought the assets were worth.

J. M. Doroshaw, president of the First Mid-Continental Corporation, came to the office about May 10, 1939, and advised he represented a company that had some of the old company stock and wanted to know about the Newman of-

fer. Pierpont advised him they had nothing to do with the offer but they were willing to give him such information about the company as he wanted. Following this meeting Doroshaw wrote inquiring about the investment portfolio and the freight rate situation as compared with transport, which information he was given. Then nothing was heard from Doroshaw until a letter dated July 12, 1939, was received suggesting a merger with Socony-Vacuum Oil Company. Pursuant to this letter a conference was had on July 25 at which time Doroshaw admitted he did not represent the Socony-Vacuum Oil Company and he was advised he did not represent the old company. However, on August 1, 1939, Doroshaw again wrote the old company, as president of the Investment Corporation of North America, and asked for facilities to mail a communication to the stockholders. On August 4 reply thereto advised the number and cost thereof and that it would be mailed. On August 23 Doroshaw mailed to the old company 2,700 copies of a letter dated August 22, together with the necessary envelopes, to be sent to the stockholders. This letter stated Manilow & Company, Inc., of Chicago, had completed negotiations with Hester & Wise, Inc., of Houston, Texas, with a view to that concern making a better offer to purchase all of the assets than the offer submitted by Indiana and contained the following: "In the event Hester & Wise, Inc., shall be satisfied with the report to be rendered by their Accountants, it has been indicated that their offer to purchase all of the assets of the company will be on a basis that should yield the stockholders at the rate of $20.00 per share for their holdings." He, however, requested that the actual mailing of these letters be withheld until a definite offer had been made, which was to be included with the letter. On August 24 he advised that the letters must be mailed by Saturday, August 26, before 1:00 p. m. On August 25 Doroshaw wired not to send out the letters and to please return the expense money that he had sent them. On August 7 N. Manilow, president of Manilow & Company of Chicago, wrote inquiring about the Indiana offer and if a better of-

fer in a similar form would be acceptable. Being advised that it would on August 14 he wrote advising their client was prepared to submit a better offer than that offered by Indiana and that they desired to make an examination of the affairs of the company and that they would send their men to Omaha for that purpose. Accordingly, Paul E. Wise, vice-president of Hester & Wise, Inc., and L. V. Brinton, manager of the accounting firm of Ernst & Ernst, came to Omaha on August 22. Brinton examined the books while Wise examined the properties and they were given all the information and assistance for which they asked. After they made a report of their investigation to their principal it was decided they were not interested in making a higher bid than Indiana's offer because they did not think the assets were worth any more and advised Pierpont to that effect.

During the latter part of June, 1939, L. L. Marcell, manager and secretary of the southern division of the Socony-Vacuum Oil Company, accompanied by Mering, contacted Pierpont in Omaha. Referring to a letter he had received from Doroshaw, he wanted to know if he represented the company. Being advised that he did not they then discussed the possibility of some kind of a merger or a purchase. They were given all the information they desired but subsequently notified Pierpont they were not interested in any further negotiations. After Indiana's offer was received and about July 24 or 25 Pierpont called Marcell on the telephone and advised him of the offer and its terms but Marcell advised they were not interested in making a better offer and nothing further was ever done.

On August 30, 1939, after Indiana's offer was accepted, Buell Jones of Indiana, who was in Omaha handling all matters for Indiana in connection with the offer, contacted Pierpont and asked him if he would care to work for Indiana in connection with the new company. As a result of this contact Pierpont accompanied Jones to Chicago where, on August 31, after a conference with the officers of Indiana, including Seubert and Barkdull, he was employed to

be president and a director of the new company at a salary of $15,000 per year, the same as he received with the old company. Palmer, secretary and a director of the old company, was also employed as secretary and a director of the new company at $5,000 per year the same as he was receiving with the old company. Humphrey, who had been vice-president and a director of the old company, was employed and made a director of the new company but at a reduced salary, being cut from $12,500 to $8,500. Their employment began on September 1, 1939. There is no evidence in the record that the employment of these men by Indiana was ever discussed or considered in any way prior to August 30, 1939. Their testimony and the testimony of the officers of Indiana is to that effect and there is nothing in the records otherwise.

Shortly after Indiana acquired the assets of the old company and had them transferred to the new company, they sent Donalin from the Chicago office to value the properties acquired, other than current assets, to allocate their value for the purpose of establishing a basis for income tax returns. He appraised these properties at $1,876,645.60 and approximately 50.9 per cent of this appraisal was allocated on the books to the balance of the purchase price, other than current assets, in the total of $955,636.89.

Shortly after Humphrey began his work with the new company he discussed with Pierpont the matter of his retiring because of a heart condition which was affecting his health. While many witnesses testify that he appeared in good health, Dr. F. Lowell Dunn testified to a nervous condition which he had arising out of a previous hernia operation. Pierpont took up the matter of Humphrey's desire to retire with Barkdull when he was in Omaha in November of 1939 and as a result an agreement was drawn up with the new company permitting Humphrey to retire on December 1, 1939, and providing "That if you will hold yourself available so that the management of this or its predecessor company may consult and advise with you with regard to the problems of either or both of said companies, as occasion

may require, that this company will pay you, in equal quarterly installments, the sum of $2,500.00 per year, for so long as you may live but not in excess of four years. Such arrangements shall commence on December 1st, 1939, and the first quarterly payment will be made on March 1st, 1940. The arrangements just mentioned are to be conditioned upon your agreement that you will not, during such four-year period, in anywise, directly or indirectly, engage or participate in any activities, employment or business that would be in competition with, or inimical to, the interests of this company or the interests of its predecessor company, Standard Oil Company (Nebraska). This company reserves the right to be the sole judge as to your compliance with the last mentioned conditions. * * *

"We may add that it is not our intention that the arrangements herein proposed would necessitate your future residence in Nebraska, nor at any other fixed or definite point, nor would they render you again eligible for participation in the company's present or any future Annuity Plan."

On December 1, 1939, Humphrey retired and shortly thereafter left Omaha and traveled for his health. He did not return to Omaha until the trial. During his travels he hiked and fished and at the time of the trial seemed to be in good health. He was carried on the records of the company as an employee.

Sometime in the forepart of 1938 Indiana considered the construction of a pipe line from its Sugar Creek, Missouri, refinery to Council Bluffs, Iowa. In September of 1938 they investigated the feasibility of such a pipe line and its location. Nothing further was done until on June 28, 1939, when the directors of Indiana approved its construction and actual work thereon was begun on August 22, 1939. A tank farm or terminal of this pipe line is located in Council Bluffs. A petition setting forth the location and specifications of this line was filed in Iowa on July 10, 1939. General newspaper publicity was given the authorization and construction of this pipe line and tank terminal at the time.

"The same general rules of pleading and proof which are applied in other actions must be applied in actions brought by a corporation against its directors for official misconduct." *Gerdes v. Reynolds,* 281 N. Y. 180, 22 N. E. 2d 331.

"In an action brought by a corporation against its directors or officers for misconduct, the necessary proof is exactly of the same character as in an action brought by an individual against his agents, servants, or employees for like misconduct, and the character of the proof is not at all affected by the fact that the action is brought by the shareholders instead of by the corporation itself." *Kavanaugh v. Commonwealth Trust Co.,* 181 N. Y. 121, 73 N. E. 562.

" * * * a 'civil conspiracy' is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *National Fireproofing Co. v. Mason Builders' Assn.,* 169 Fed. 259, 26 L. R. A. n. s. 148.

"The principle element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury." *Reid v. Brechet,* 117 Neb. 411, 220 N. W. 590.

"To constitute a conspiracy there must be a combination of two or more persons; * * * a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy." 15 C. J. S., sec. 2, p. 997.

As stated in 13 Fletcher, Cyclopedia Corporations (Perm. ed.) sec. 6026, p. 424: "If relied on by plaintiff, ;he must prove fraud, * * * ." We have on numerous occasions held that fraud is never presumed. As stated in *Giles & Son v. Horner,* 97 Neb. 162, 149 N. W. 333: " 'Fraud is never presumed, but must be clearly proved in order to entitle a party to relief on the ground that it has been practiced on him.' *Davidson v. Crosby,* 49 Neb. 60." In *Glissmann v. Orchard,* 139 Neb. 344, 297 N. W. 612: " 'Fraud is never to be presumed. It must be proved. * * * Evidence simply justifying a suspicion is not sufficient. * * * .' *Bank of*

*Commerce of Grand Island v. Schlotfeldt,* 40 Neb. 212, 58
N. W. 727." *In re Estate of Sheerer,* 137 Neb. 374, 289
N. W. 529: " * * * fraud will not be imputed where cir-
cumstances and facts upon which it is based may be con-
sistent with honesty of purpose." In *Ashby v. Peters,* 128
Neb. 338, 258 N. W. 639: "The presumption is that all
men act honestly, and therefore fraud is never presumed,
but must be proved by the plaintiff."

However, to prove fraud direct evidence is not always es-
sential. Inferences or presumptions of fraud may be drawn
from facts and circumstances. But such inferences or pre-
sumptions must not be guess work or conjecture but must
be rational and logical deductions from the facts and cir-
cumstances from which they are inferred. As stated in
*Lebs v. Mutual Benefit Health & Accident Assn.,* 124 Neb.
491, 247 N. W. 19: "It is a well-established rule that pre-
sumptions and inferences may be drawn only from facts es-
tablished, * * * ." But as stated in *Blid v. Chicago & N. W.
Ry. Co.,* 89 Neb. 689, 131 N. W. 1027: " * * * circumstan-
tial evidence cannot be said to be sufficient to sustain a ver-
dict depending solely thereon for support, unless the cir-
cumstances proved by the evidence are of such a nature
and so related to each other that the conclusion reached is
the only one that can fairly and reasonably be drawn there-
from."

That Pierpont and Palmer stood in a fiduciary relation-
ship to the stockholders and the old corporation is without
question. "An officer or director of a corporation occupies
a fiduciary relation towards the corporation and its stock-
holders." *Fisher v. National Mtg. Loan Co.,* 132 Neb. 185,
271 N. W. 433. "A director of a corporation bears to it
and its stockholders a fiduciary relation and is treated by
courts of equity as a trustee." *Howell v. Poff,* 122 Neb. 793,
241 N. W. 548. The nature of the trust is stated in *Wha-
ley v. Matthews,* 134 Neb. 875, 280 N. W. 159, as follows:
" 'Every violation by a trustee of a duty required of it by
law, whether wilful and fraudulent, or done through negli-
gence, or arising through mere oversight or forgetfulness,

is a breach of trust.' *First Trust Co. v. Carlsen,* 129 Neb. 118, 261 N. W. 333."

We have often announced the rule that, "the burden of proof is upon a party holding a confidential or fiduciary relation to establish the perfect fairness, adequacy and equity of a transaction with the party with whom he holds such relation; * * * ." *Barber v. Martin,* 67 Neb. 445, 93 N. W. 722. "But where a fiduciary relation exists between the parties to a transaction the burden of proof of its fairness is upon the fiduciary." 10 R. C. L., sec. 46-47, p. 898. "Where a contract or other transaction has been entered into by defendants having an interest which conflicts with that of the corporation, it is for them to show that it was fair and free from fraud; and when trust funds are traced to their hands they have the burden of accounting for them. A third person in possession of alleged corporate assets does not have this burden unless some fraud is imputable to him." 13 Fletcher, Cyclopedia Corporations (Perm. ed.) sec. 6026, p. 425.

This is not an action in which the officers or directors of the corporation purchased property of the corporation or sold their own property to it or where they used the assets of the corporation to obtain a profit for themselves. Here the officers and directors entered into negotiations for the sale of its assets and recommended the acceptance of the offer received.

As stated in *First Trust Co. v. Carlsen,* 129 Neb. 118, 261 N. W. 333: "It is the duty of a trustee to fully inform the *cestui que trust* of all facts relating to the subject-matter of the trust which come to the knowledge of the trustee and which are material for the *cestui que trust* to know for the protection of his interests."

"It is a well-settled principle of the law of fraud, applied particularly by courts of equitable jurisdiction, that it is the duty of a person in whom confidence is reposed by virtue of the situation of trust arising out of a confidential or fiduciary relationship to make a full disclosure of any and all material facts within his knowledge relating to a con-

templated transaction with the other party to such relationship, and any concealment or failure to disclose such facts is fraud." 23 Am. Jur., sec. 81, p. 858.

"Directors and other officers must exercise the utmost good faith in all transactions touching their duties to the corporation and its property, * * * . They must order their conduct so as to place the performance of their corporate duties above their personal concerns." 3 Fletcher, Cyclopedia Corporations (Perm. ed.) sec. 850, p. 162. "A trustee must dispose of trust property upon the most advantageous terms which it is possible for him to secure for the benefit of the estate which he represents." *Clark v. Provident Trust Co.*, 329 Pa. St. 421, 198 Atl. 36. Should get all they can. *Wheeler v. Abilene Nat. Bank Bldg. Co.*, 159 Fed. 391.

When relief on account of fraud is sought the burden of proving the existence of any fiduciary or confidential relationship or of any unequal footing is upon him who may allege such a status and the existence of such a status, when proved, does not change the position of the burden of proving the existence of fraud. Such a status may be sufficient to cause fraud in a proved transaction to be legally inferred and thus to place the burden of going forward with the evidence upon the party charged with fraud. In this connection the phrases "burden of proof" and "burden of going forward with the evidence" should not be confused. *Leichner v. First Trust Co.*, 133 Neb. 170, 274 N. W. 475; *Miles v. Pike Mining Co.*, 124 Wis. 278, 102 N. W. 555; 22 C. J., sec. 13, p. 67; *In re Estate of Hagan*, 143 Neb. 459, 9 N. W. 2d 794.

" 'Fraud cannot be presumed or inferred without proof in a court of equity, any more than in a court of law.' * * * However, courts of equity do not restrict themselves by the same rigid rules as courts of law in the investigation of fraud and in the evidence and proofs required to establish it. * * * the proof must be sufficient to satisfy the conscience of the chancellor or court that fraud is really existent, and to do this, it must be sufficient to overcome the nat-

ural presumption, which is always of considerable force, that men are honest and act from correct motives." 19 Am. Jur., sec. 43, p. 66.

While Indiana, sole owner of the new company, is a third party it can hardly be said that it dealt at arm's length with the officers and directors of the old company because of the long established close and confidential relationship between the two as disclosed by the record and hereinbefore set forth. Under these circumstances a court of equity will examine all of the facts disclosed by the record and apply the rules herein discussed to see if any conspiracy to defraud the stockholders of the old company was entered into by the parties whereby the stockholders were induced to sell the assets of the old company for less than their value and to satisfy itself whether or not the dealings had between the parties were fair and honest.

All negotiations with Indiana were carried on by personal contact until the formal offer of July 21, 1939, and were confined strictly to the officers and directors until the release to the press of July 26, 1939. It had been agreed between the officers and directors of the two companies to keep the negotiations secret in order that no one, either stockholder or outsider, might take advantage of this information for his personal gain by dealing in the stock on the curb exchange. That such advantage could be taken is evident from the market price during this period:

| | | | | | |
|---|---|---|---|---|---|
| May, 1939 | High | 8 7/8 | Low | 7 | 1/2 |
| June, 1939 | High | 11 | Low | 8 | |
| July, 1939 | High | 15 1/2 | Low | 9 | 1/4 |

However, the sale of the stock on the market started to rise sharply. The number of shares sold during May, June and July being as follows:

| | |
|---|---|
| May, 1939 | 1,300 shares |
| June, 1939 | 3,600 shares |
| July, 1939 | 12,900 shares |

There were sold on July 24, 700 shares, on July 25, 2,000 shares and on July 26, 1,200 shares. Pierpont, on the latter date, called Seubert and discussed this sharp increase

in sales of the stock. Feeling there was a leak some place they then decided to release the offer to the press although it had not been sent to the stockholders. It was mailed to the stockholders on July 29. The reasons for keeping these negotiations secret are apparent and reasonable and protected the stockholder. We find nothing of a fraudulent nature therein.

Plaintiffs suggest that the excessive operative overhead, as disclosed by the efficiency survey, was the cause of the old company's inability to operate at a profit and by the failure of the officers and directors to inform the stockholders thereof in the proxy they were derelict in their duties and the same is evidence of bad faith and fraud. Whether or not the old company could have operated at a profit during the years of 1932 to 1938, if its operative overhead had been cut down in accordance with the suggestions of the efficiency experts, is highly speculative. As soon as these suggestions were agreed upon during the survey, conducted from January to June of 1939, they were put in effect. Notwithstanding these economies the old company, during its operations for the first eight months of 1939, sustained substantial losses and, during the entire year of 1939, its losses, under both the old and new company, were $194,000. This may have been due to the loss in realization on sales, which, during the first 8 months of 1939 as compared with the same period in 1938, was $123,169.33. The operation of the company, the handling of employees and the control of operative overhead are matters of management and the mishandling thereof is not a badge of fraud in the sale of the assets.

No reference to these economies was contained in the proxy statement. However, there was no effort made to conceal the fact that the survey was being made and put into effect. The employees knew it. Pierpont made a statement thereof to the stockholders present at the meeting of June 12, 1939, although all the economies proposed were not then fully in effect. Publicity was given in the press showing a possible total savings annually of $115,078. Just

what its total effect would have been upon the successful operation of the old company is uncertain and very speculative.

In 1921 the old company, with the approval of the Department of Internal Revenue, adopted a straight line depreciation, retroactive to 1906, whereby an annual depreciation was taken on buildings, tanks, pipes and fittings of 4 per cent, machinery and tools of 7 1/2 per cent, furniture of 10 per cent and miscellaneous articles of 8 1/3 per cent. Plaintiffs' witnesses testified that as a result of this policy considerable of the company's property was fully depreciated that was still valuable and in use. That other items, which had been charged to expense, were likewise of value and being used in the old company's operations. They then offered testimony to establish the value of all the fixed assets of the old company as of the date of the sale. Plaintiffs contend that the depreciation taken was in excess of actual loss; that the proxy statement did not properly reflect the true condition of the company; and that, in order to properly and correctly inform the stockholders of the condition of the company, an appraisal should have been made of the fixed assets of the company as a basis for the statement contained in the proxy. Particularly in view of Pierpont's statements, contained in his answers to stockholders' inquiries about Newman's offer, that he believed the book value to be a reasonably close value of the properties and Roser's testimony that in June of 1939 he told Pierpont, in the presence of Hughes, McCauley and Kastl, that many items fully depreciated were still assets of the company. This statement Pierpont, McCauley, Kastl and Hughes deny he made.

It is admitted that the statements of the old company, as set out in the proxy statement, correctly reflect the condition of the old company as shown by its books. An audit is made from the records of the company as contained in its books and, unless some special reason is shown therefor, an appraisal of the assets is no part of such audit. Ordinarily the officers and directors are entitled to rely on

the records of the company as reflecting its true condition.

A depreciation charge is an estimate of the average loss in value that a certain class of property will sustain over a fixed period of time. It does not contemplate meeting the exact date when each piece or parcel of that class will no longer be usable or have any value. It is an estimate of what the average of all the property of that class will depreciate, recognizing the fact that some will depreciate faster than others. That some will last beyond the period is to be expected and others, of course, will not.

Plaintiffs' appraised value of the fixed assets of the old company is $2,519,615 while the book value thereof, as reflected in the statement of May 31, 1939, was $2,716,345.57. This latter figure is from the statement sent to the stockholders with the offer. Under these circumstances we can see no reason why the officers and directors should have had an appraisal made. What benefit would thereby have been gained by the stockholders? The plaintiffs' appraised value of the fixed assets is less than the book value. The latter the stockholders had before them when they voted to accept the offer.

Plaintiffs point to the requirement that an $800,000 deposit accompany a bid, as was required of Indiana, as a method used to stifle or chill competitive bidding on the assets. With the exception of Carpenter, whose testimony is hereinafter discussed, all of the parties with whom the negotiations were had or witnesses who were interested in a similar business testified that such a requirement was not unreasonable and in no way did it or would it have deterred them from making a bid on the assets. We do not find such a requirement unreasonable and that it in fact stifled or chilled competitive bidding.

Plaintiffs object to the manner in which the assets were sold. They point to the fact that no bidders were solicited, except Indiana; that the assets were not advertised for sale; and that no auction of the assets was held at the stockholders' meeting of August 29. The directors' and the stockholders' committee discussed the matter of advertis-

ing the assets but decided not to do so because it might appear to the public to be a distressed sale, when in fact it was not, and thereby tend to decrease its value. Wide publicity was given the offers and proposed offer. The numerous contacts made by parties in the same business and interested in acquiring the assets show that this publicity brought it to their attention. Advertising could have accomplished no more. No officer or director of the old company ever solicited any prospect except Indiana. However, others did negotiate with the old company with regard to a possible merger or purchase. Pierpont freely and fully negotiated with these prospects giving them all the information they desired. The evidence fails to disclose any one who would have been interested in the assets but who lacked knowledge that the same were for sale. In the absence of such a showing it would be purely speculative to say that such failure to advertise or solicit in any way prevented a better or higher bid from being received. There is nothing in the proxy statement or proxies, for or against the sale, that indicates an auction of the assets would be held at the stockholders' meeting of August 29. In keeping with the proxy statement and proxy for a sale the question was asked at the meeting whether any one wished to make a bid before Indiana's offer was acted upon. No one appearing who was interested the offer of Indiana was accepted. An auction sale is not an absolute right. From the evidence it is apparent that an auction at this meeting would have served no purpose for the evidence fails to show any other bidders present. These objections all raise the question of how to obtain the best sale price. There is nothing in the evidence to show that this was not accomplished.

There were others negotiating with the old company, some seeking to buy controlling interest in the stock, others to buy the assets. The evidence discloses that Indiana and its officers had no interest in these negotiations, either directly or indirectly. In fact, they were not even acquainted with the individuals carrying on the negotiations or the

companies they represented. In this we are not overlooking the letter of Doroshaw to Barkdull of May 17, 1939, wherein he expresses his opinion that the purchase price could be materially reduced if Pierpont was retained in some official capacity by the purchaser. There is no evidence that Barkdull or any other officer of Indiana ever acted on this communication. It merely represents Doroshaw's opinion and has no relation to the negotiations here involved.

The only interest any of the officers and directors of the old company had in the new company was their employment by Indiana shortly after the old company had accepted the offer, Pierpont and Palmer at the same and Humphrey at a reduced salary. They acquired no ownership in the new company. Plaintiffs claim that this employment was prearranged and the failure to advise the stockholders thereof was evidence of a conspiracy to defraud. There is no evidence that such employment was prearranged. Under the situation here, we do not think the fact that these officers were employed by Indiana to be active in the management of the new business at no increase of salary and, in one instance, at a substantial decrease established a conspiracy to defraud. *Mitchell v. Highland-Western Glass Co.*, 19 Del. Ch. 326, 167 Atl. 831; *Allaun v. Consolidated Oil Co.*, 16 Del. Ch. 318, 147 Atl. 257; *Price v. Fraser*, 119 Neb. 806, 231 N. W. 18.

Shortly after his employment by the new company Humphrey suggested to Pierpont that he would like to retire because of his health and later discussed it with Barkdull. As a result of these conferences an agreement was drawn up permitting Humphrey to retire December 1, 1939, under the terms as set out in our statement of facts. Plaintiffs offered evidence to show that Humphrey had always been in good health and points to the contract as a payoff to Humphrey for his part in the conspiracy to defraud. That Humphrey had been in ill health due to a nervous condition is shown by the testimony of Dr. Dunn. Just how sick he was at the time is not definitely shown but he

appears to have been in good health at the time of the trial. Humphrey had been with the old company a long time and was familiar with the retail merchandising of gasoline throughout the state and had wide experience and acquaintances. That the new company felt he could be valuable to them and to others in the same business seems reasonable in view of the size of the business and the extent of its operations. Such contracts are often made in the business world and we can find nothing wrong therewith.

The old company had the exclusive use in Nebraska of the trade name and mark of its products as hereinbefore set forth plus whatever goodwill the company had by reason of its past operations. In advertising these products it had been spending about $100,000 per year. These were not carried on the books of the company as an asset nor included as such in its financial statement.

The old company had been losing money for a period of years. Courts seem to be divided on whether there is any value in the goodwill of a business which has been losing money over a period of years. That such goodwill has no value, see *Ahlenius v. Bunn & Humphreys*, 358 Ill. 155, 192 N. E. 824; *Crawford v. Mexican Petroleum Co.*, 130 Fed. 2d 359; *Nahtel Corporation v. West Virginia Pulp & Paper Co.*, 134 Fed. 2d 197; and to the contrary, see *Macfadden v. Jenkins*, 40 N. D. 422, 169 N. W. 151; *Rookwood Pottery Co. v. Commissioner of Internal Revenue*, 45 Fed. 2d 43; *Barden Cream & Milk Co. v. Mooney*, 305 Mass. 545, 26 N. E. 2d 324.

That they had value to Indiana is evidenced by the interest shown by its officers when, in his written memorandum, Pierpont called their attention to their possible loss, by the fact that they were expressly included in Indiana's offer and by the immediate incorporation of the new company to prevent any possible loss thereof. There was no concealment by the officers and directors of the old company that it owned these trade names and marks and that the offer included them, together with the goodwill, because the offer of Indiana was fully set out in the proxy

statement. Just what their value might be is difficult to say. The only evidence in the record as to their value is the testimony of Terry Carpenter that they were worth $500,000.

Let us here consider the testimony of this witness. On May 5, 1939, he released to the press an offer of $13 per share for 51 per cent of the stock of the old company. A total of $2,098,239 for the 161,403 shares outstanding. This proposed offer he sent to the old company plus a suggestion of merger. When they immediately replied they would submit his offer to the stockholders he did nothing further to carry out his proposal. At that time no requirement was made of a deposit of $800,000 which he testifies would deter bidders for the assets. This was at a time when the old company still owned the assets and a bid could have been accepted by the stockholders. At the time of the trial, when the assets had been sold and any possibility of buying them was past, he testifies he would have been willing to give $4,750,000 had he been given an opportunity to bid for the assets in his own way. There is nothing in the record to show he was prevented from making any investigation that he desired of the old company nor to prevent him from attaching such conditions to the offer as he wished. Such testimony has little weight or credibility. It impresses the court that his real opinion of the value of all the assets was expressed at the time of his proposed offer, when the assets could still be purchased, rather than subsequently when that possibility was gone.

What the value of the trade names and marks together with goodwill was might differ with each person's opinion. The officers were under no obligation to give an opinion of their value as long as they properly disclosed to the stockholders that they were included in the offer.

Plaintiffs point to the failure of the proxy to contain any information as to the pipe line of Indiana from its refinery at Sugar Creek, Missouri, to its tank farm at Council Bluffs, Iowa, as evidence of fraud. This pipe line was built by Indiana and at the time of its authorization and con-

struction received wide publicity in the press. While it is probable that the old company, being a good customer of Indiana, might receive some benefits from this pipe line in the way of reduced rates, particularly in the Omaha area, but to what extent is very uncertain. Whether there would be any adjustment in freight rates was also uncertain for during the many years of truck transport competition no adjustment had been made by the railroads. The record discloses no effort to conceal the authorization and construction of the pipe line.

Plaintiffs point to the policy of the old company in refusing to give any one the list of stockholders and their addresses as a badge of fraud. This had been the policy of the company for many years and not one newly established by those negotiating the sale of the assets. The evidence shows that the officers and directors of the old company always made it possible for everyone, either stockholder or outsider, to communicate with the stockholders on matters affecting the company. While we do not approve this policy as to stockholders, in this case it did not prevent any one, either stockholder, stockholders' committee, or outsider, from sending an offer or communicating with the stockholders on any matter affecting the negotiations or sale of the assets. We fail to see how it in any way affected or influenced the stockholders in their decision to accept Indiana's offer.

This court has followed the rule as stated in *Price v. Fraser, supra*: "Transactions between corporations having common officers and directors are presumptively fraudulent and the burden is upon the defendants to sustain the transactions by clear and convincing evidence that they were fair." But it has no application here. At the time Indiana made its offer none of its officers or directors were officers or directors of the old company and the same is true as to the officers and directors of the old company as to Indiana. Nor does the fact that Pierpont, Palmer and Humphrey became officers and directors of the new company, with Indiana as the sole owner, after the offer was

accepted bring it within the rule. However, for the reasons already stated, we will consider and determine if the contract was in fact fair and for an adequate consideration.

The officers and directors of the old company made no effort to gain any financial advantage through the sale of the assets. During the time negotiations with Indiana and others were being carried on and known only by them, and the parties they were dealing with, the price of the stock on the curb exchange was such that they could have benefited themselves handsomely. There is no evidence that they dealt therein, either directly or indirectly, even to the extent of one share. These directors personally owned a total of 2,542 shares. For these shares they recovered the same as all other stockholders. They acquired no interest in the new company either by gift or purchase. Pierpont, Palmer and Humphrey were employed by the new company either at the same or a reduced salary. If these officers and directors had been seeking to defraud the stockholders for their personal gain, many opportunities presented themselves whereby they could have done so. We ascertain and determine that they did not seek to make any profit, not common to all stockholders, and that they acted for the best interests of the stockholders.

Plaintiffs call attention to other specific facts and circumstances, such as, the form of the proxies sent to the stockholders to vote for and against the sale, the material parts of which have been set forth in our statement of facts; the failure to correct Reimer's statement at the stockholders' meeting of June 12, 1939, which was, as stated, a correct statement of losses in assets as shown by the annual statements of the old company; and the claim that the special stockholders' meeting of August 29, 1939, was hurriedly called when, in fact, 30 days' notice was given and the articles of incorporation and bylaws required only 10. We have carefully examined the record and find that the negotiations with Indiana and others who were interested in either merging with or buying the assets were honestly and fairly conducted; that the proxy statement and prox-

ies fully stated the offer, the condition of the old company and placed before the stockholders a full picture of their company; and that the directors were honest and faithful in their recommendation for its acceptance if no better offer was received.

Was the amount Indiana paid for the assets so shockingly inadequate as to justify a finding of conspiracy, fraud and breach of trust? "Value of property is always a matter of judgment, and a contract based upon inadequate consideration will not be set aside for that reason alone, unless, as the rule is generally stated, the inadequacy is so great as to furnish of itself convincing evidence of fraud." *Price v. Fraser, supra.*

The evidence shows that Indiana paid $17.50 per share for 161,403 shares of outstanding stock owned by 2,463 stockholders or a total of $2,824,552.50 plus $44,406.44 taxes that had accrued, but not shown on the books of the old company, for all the assets. These assets, after deducting current liabilities, had a book value, as shown by the statement of May 31, 1939, of $4,629,433.20. This did not include any value for the company's exclusive right to use certain trade names and marks in Nebraska or goodwill. These were not carried on the books of the company as assets. They were, however, expressly included in Indiana's offer. These assets, including trade names and marks and goodwill, were appraised by plaintiffs' witnesses at $4,932,-703.21 or approximately 6.5 per cent more than the book value. It should be remembered that this is not a case where the property of a corporation was purchased by its officers and directors but by a third party, as Indiana was the sole owner of the new company, although not dealing at arm's length.

"When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible." *Borg v. International Silver Co.,* 11 Fed. 2d 147. "Mere book value should not govern in determining the value of the shares of objecting stockholders (*Homer v. Crown Cork and Seal Co.,*

155 Md. 66), and appraisal values are not necessarily controlling (*Allied Chemical & Dye Corp. v. Steel and Tube Co. of America, supra*), (14 Del. Ch. 64, 122 Atl. 142). * * * 'Everyone knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw very little light. When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible.'" *Ahlenius v. Bunn & Humphreys, supra.*

How much could the corporation get for its assets and did the officers and directors of the old company act fairly and honestly with their stockholders in recommending the acceptance of Indiana's bid? What is a fair price for which to sell property is always a matter of opinion and honest opinions on value vary widely. Value can only be determined by a careful consideration of every relevant and material fact and circumstance bearing upon an actual sale of the property. In proportion to the distance the property in question is removed from the quality of simplicity and common familiarity, the difficulty of ascertaining the question of its fair selling value is increased. "It is elementary that anything that will affect selling price in the market enters into the term 'value.'" *Gilmore v. Central Maine Power Co.*, 127 Me. 522, 145 Atl. 137. Many factors should be considered in fixing the value of stock for sale purposes. *Matter of Fulton*, 257 N. Y. 487, 178 N. E. 766. See, also, *Borg v. International Silver Co., supra; Ahlenius v. Bunn & Humphreys, supra; Homer v. Crown Cork and Seal Co., supra; Price v. Fraser, supra; Allied Chemical & Dye Corporation v. Steel and Tube Co., supra.* No one factor is controlling. Many factors controlled its value; including, the diversity of its location over the entire state and the difficulties arising in its operation by reason thereof; its past earning power and its present and possible prospect for earnings and ability to pay dividends; the location of its various properties and their one purpose function; increase of competition; the condition of its proper-

ties, particularly as to obsolescence of its facilities; and unfavorable marketing conditions. There is no proof that any greater offer was ever made for the assets or that any one was ready, able and willing at the time to pay a greater price for it. In fact, in all the negotiations with those interested in acquiring the assets and business of the old company no one offered anywhere near the amount of Indiana's offer nor is there any evidence that any one would have offered a better price. That the assets were for sale was given wide publicity. That those interested in the petroleum business had knowledge thereof is well established by the evidence. That others acquainted with the assets and engaged in the same business either declined to make a bid or bid much less than the bid accepted is strong evidence that the sale price was fair.

Considering the appraisals made of the property by the witnesses and the basis thereof—the value of the property as shown by the books, the evidence on the many factors that affected its value, together with the fact that no other person or company was ready, able and willing, at the time to pay a greater price for it, we do not think the officers of the old company breached their fiduciary obligations to the stockholders in recommending the sale. We find that the assets of the old company were sold for their fair value.

While fraud is never presumed and the party alleging and relying thereon must prove it, however, what constitutes fraud is a matter of fact in each case. Deception may find expression in such a variety of ways that most courts have studiously avoided reducing its elements to positive definitions. Courts should content themselves with determining from the facts in each case whether fraud does or does not exist, for whatever satisfies the mind and conscience that fraud has or has not been practiced is sufficient. Without repeating any further facts or discussing them, we have come to the conclusion that there was no conspiracy between any of the officers and directors of the old company and any of the officers and directors of Indiana to defraud the old company and its stockholders out of

the assets of the old company by buying them for less than their actual value, and that in fact the stockholders of the old company received a fair and adequate consideration for the assets of the old company. The judgment of the lower court is therefore vacated and set aside and the action dismissed at plaintiffs' cost.

REVERSED AND DISMISSED.